ADAM CROWN by MR. SHAHAN                              50

1      Q    Did there come a time you made a
2   complaint to PESH?
3      A    Yes.
4      Q    When did you make that complaint?
5      A    I don't remember the exact date, went out
6   early in 2010.
7      Q    Do you recall the date -- well, withdraw
8   that.
9           When did you start drafting the complaint
10  to PESH?
11     A    In 2009.
12     Q    And what was the basis for your complaint
13  to PESH?
14     A    I don't recall in detail, I can provide
15  you with the document if you want.
16     Q    Can you provide me with a synopsis of
17  what the complaint was in your own words?
18     A    I observed what I believed to be
19  infractions of safety regulations.
20     Q    Can you recall any specific infraction?
21     A    Officers not wearing their personal
22  protective gear to the scene, as an example.
23     Q    Anything else?
24     A    Not checking equipment, not proper

ADAM CROWN by MR. SHAHAN                                    51

1    training.   Training was a major issue.

2         Q    Anything else?

3         A    I don't recall.

4         Q    Handing you what's been marked as Exhibit

5    15 for identification purposes and ask you to

6    take a look at that.   Is that the complaint that

7    you filed?

8         A    Yes.

9         Q    Did that indicate it was received by the

10   Department of Labor on March 11th?

11        A    I'm sorry?   What was the question?

12        Q    Does that indicate it was received by the

13   Department of Labor on March 11th?

14        A    Yes.

15        Q    And does that indicate on page 2 it was

16   signed by you on March 5th?

17        A    Yes.

18        Q    Do you know when the fire company became

19   aware of this complaint?

20        A    No.

21        Q    Did you advise them that you made this

22   complaint?

23        A    No.

24        Q    Did you go to the meeting on March 12th?

ADAM CROWN by MR. SHAHAN                                    52

1        A    I'm sorry, which meeting are you

2   referring to?

3        Q    Meeting with Chief Gaden on March 12,

4   2010?

5        A    No.

6        Q    I'm handing you what's been marked as

7   Exhibit 9 for identification.  Do you recall

8   receiving that letter?

9        A    Yes.

10       Q    Does that letter advise you you were

11  suspended, correct?

12       A    Yes.

13       Q    And advised you to attend a Board of Fire

14  Commissioners meeting on March 23rd, correct?

15       A    Correct.

16       Q    I'm going to hand you what's been marked

17  for identification purposes as Exhibit 10; do you

18  recognize that?

19       A    Yes.

20       Q    Is that your e-mail address?

21       A    I'm sorry?

22       Q    Is that your e-mail address?

23       A    21FV@lightning.com?

24       Q    Yes.

ADAM CROWN by MR. SHAHAN                                        53

1      A    Yes.

2      Q    Do you recall receiving that?

3      A    Oh, yes.

4      Q    What's the date on that e-mail?

5      A    March 14, 2013.

6      Q    After receiving that e-mail, did you

7   contact Mr. Butler?

8      A    I don't think so.

9      Q    After receiving that e-mail, did you

10   contact counsel?

11     A    No.

12     Q    Were you aware that that e-mail advises

13   you that you have a right to have counsel present

14   at the meeting of March 23rd, correct?

15     A    Correct.

16     Q    When you went to the meeting on March

17   23rd, did you have counsel with you?

18     A    No.

19     Q    Did you bring anyone with you to that

20   meeting?

21     A    I'm sorry?

22     Q    Did you bring anyone with you to that

23   meeting?

24     A    No.

ADAM CROWN by MR. SHAHAN                                    54

1      Q    Did anyone come to that meeting --
2   withdraw that.
3           Had you contacted an attorney between the
4   time that you received the e-mail of March 14th
5   and the time you attended the meeting on March
6   23rd?
7      A    I don't recall.
8      Q    Did you have an attorney at the time?
9      A    No.
10     Q    When you arrived at the meeting, who was
11  present?
12     A    I don't recall.
13     Q    Was Mr. Butler present?
14     A    Yes.
15     Q    Were members of the Board of Fire
16  Commissioners present?
17     A    I don't recall which once.
18     Q    Was anyone else present?
19     A    I don't remember.
20     Q    When -- what happened -- what was the
21  first thing that happened at the meeting?
22     A    First thing that happened, I'm not sure.
23     Q    Did there come a time that you went into
24  executive session?

ADAM CROWN by MR. SHAHAN                                   55

1        A    Yes.

2        Q    What happened in executive session?

3        A    I'm not sure where to start with this.

4    Can you rephrase it?  What are you asking, more

5    specifically, perhaps?

6        Q    Well, in executive session, was the Board

7    of Fire Commissioners present during executive

8    session?

9        A    I believe some of them were.

10       Q    Do you recall who?

11       A    No.

12       Q    Do you recall whether Mr. Butler was

13   present?

14       A    Mr. Butler was present.

15       Q    Were you present?

16       A    Yes.

17       Q    Was anyone else present?

18       A    I don't recall.

19       Q    Do you recall what was said to you in

20   executive session in the presence of the fire

21   commissioners and Mr. Butler?

22       A    Yes.

23       Q    What was said to you?

24       A    He said he was going to give me an

ADAM CROWN by MR. SHAHAN

56

1    opportunity to resign.

2       Q   And were any options given to you if you

3    did not resign?

4       A   Yes.  If I didn't resign, they were going

5    to defer departmental and criminal charges

6    against me.

7       Q   What were the departmental charges going

8    to consist of?

9       A   Misconduct.

10      Q   Did they provide you with a copy of any

11   charges?

12      A   Yes.

13      Q   Handing you what's been marked as Exhibit

14   11 for identification purposes.  Do you recognize

15   those?

16      A   Yes.

17      Q   Were those the charges that were given to

18   you at the March 23rd meeting?

19      A   I believe they are.

20      Q   What happened at that point?

21      A   I'm not sure the order of things.

22      Q   What's your best recollection as to the

23   order of things?

24      A   I think first Mr. Butler said to me they

ADAM CROWN by MR. SHAHAN                                    57

1    were going to give me an opportunity to resign,

2    and then I undertook to record the incident

3    conversation on my records, to which Mr. Butler

4    protested and I finally acquiesced to turn off

5    the tape recorder in order to find out what the

6    meeting was about.

7         Q    What happened at that point?

8         A    Then I think he presented this paper with

9    these charges and I said I denied the charges,

10   and I wanted a hearing, and I believe it was at

11   that point that everyone else left and Mr. Butler

12   and I remained alone.

13        Q    When he handed you the notice of hearing,

14   which is Exhibit 11, did you read that?

15        A    I probably did.

16        Q    And you understood that you were going to

17   be provided with a copy pursuant to General

18   Municipal Law?

19        A    I think, yeah.

20        Q    And you understood there would be a

21   stenographic record made of that hearing?

22        A    I didn't know that specifically at the

23   time or not.

24        Q    I'll put that back in front of you.   Is

ADAM CROWN by MR. SHAHAN                                    58

1    that what it says in the second paragraph?

2        A    Here it is, third paragraph, yes.

3        Q    And does it also say that a hearing

4    officer would be appointed?

5        A    Yes.

6        Q    And that you would have the right to

7    assistance of counsel?

8        A    Yes.

9        Q    And on the second page, did you have the

10   right to compel the testimony of the witnesses

11   through process available through the Danby Fire

12   Department?

13       A    Yes.

14       Q    And you had a right to a copy of the

15   stenographic record?

16       A    Yes.

17       Q    And you would have a right to review the

18   results of the proceeding under Article 78 of the

19   Civil Practice Law and Rules?

20       A    Yes.

21       Q    Now, at some point Mr. Butler and you

22   remained in the room by yourselves?

23       A    That is correct.

24       Q    All of the fire commissioners left the

ADAM CROWN by MR. SHAHAN

59

1   room?

2      A   Yes.

3      Q   Prior to that point, had you seen a

4   letter of resignation?

5      A   I don't remember when he showed it to me

6   first.

7      Q   You don't remember whether it was in the

8   presence of the fire commissioners or had the two

9   of you met privately?

10      A   I don't recall.

11      Q   Handing you what's been marked as Exhibit

12   13 for identification purposes.  Do you recognize

13   that?

14      A   Yes.

15      Q   And is that the letter of resignation you

16   were given?

17      A   This is the letter I was given.

18      Q   And that letter is an unsigned version of

19   that letter, correct?

20      A   Correct.

21      Q   Has your address on it?

22      A   Yes, it does.

23      Q   And a place for your signature, correct?

24      A   I beg your pardon?

ADAM CROWN by MR. SHAHAN                                    60

1        Q    Has a place for your signature?

2        A    It does.

3        Q    Did there come time that evening that you

4    signed that letter?

5        A    Yes.

6        Q    Did you discuss signing that letter with

7    anyone prior to the time you signed it?

8        A    Yes.

9        Q    Who did you discuss it with?

10       A    I discussed it with my wife and I

11   discussed it with my colleague, Linda Wyatt.

12       Q    Was Linda Wyatt at the meeting?

13       A    She was at the general meetings, she

14   wasn't at the executive session.

15       Q    She was at the general fire commissioners

16   meeting?

17       A    Yes.

18       Q    Was she there at your invitation?

19       A    I'm sorry?

20       Q    Was she there at your invitation?

21       A    No.

22       Q    She came of her own accord?

23       A    Yes.

24       Q    Did she know your matter was going to be

ADAM CROWN by MR. SHAHAN                                      61

1    on the agenda?

2         A    I don't know.

3         Q    What did you and Linda Wyatt discuss?

4         A    I told her what Mr. Butler had told me

5    and I asked if she had an opinion.

6         Q    What had Mr. Butler told you?

7         A    He told me if I didn't resign, I was

8    going to be subject to departmental charges and

9    criminal charges.

10        Q    When did he tell you that?

11        A    I'm sorry?

12        Q    When did they tell you that?

13        A    He told me that in the course of our

14   conversation.

15        Q    The course of your private conversation?

16        A    Yes.

17        Q    Anything else you recall about that

18   private conversation?

19        A    Not offhand.

20        Q    What did Ms. Wyatt say to you?

21        A    She said the fire company is not worth

22   it, get out from under the charges, don't face

23   criminal charges.  That was her advice.

24        Q    Handing you what's been marked for

ADAM CROWN by MR. SHAHAN                                    62

1    identification purposes as Exhibit 14; do you

2    recognize that?

3        A    Yes.

4        Q    What is that?

5        A    This appears to be a copy of the version

6    of this document that I signed.

7        Q    Is there a change to the body of that

8    letter?

9        A    Yes.

10       Q    And what did that change say?

11       A    It says, "this shall not include

12   qualification for running or election as fire

13   district commissioner."

14       Q    Is that in your writing?

15       A    No.

16       Q    Whose writing is that, if you know?

17       A    Mr. Butler wrote it.

18       Q    Did Mr. Butler write that at your

19   request?

20       A    No.

21       Q    Did you and Mr. Butler discuss the fact

22   you had reservations about giving up your right

23   to run as a fire commissioner?

24       A    Yes.

ADAM CROWN by MR. SHAHAN                                   63

1        Q    Did you specifically ask that be included
2    in the letter?
3        A    No.
4        Q    Did you initial that change to the
5    letter?
6        A    I did.
7        Q    Did you sign the letter?
8        A    Yes, I did.
9        Q    I'm going to hand you what's been marked
10   for identification purposes as Exhibit 17.   Do
11   you recognize that?
12       A    Yes.
13       Q    What is that?
14       A    I believe this is an editorial I
15   published on a blog for --
16       Q    Was a link to your blog ever placed on
17   the fire company's website?
18       A    I believe so, yes.
19       Q    Who placed it there?
20       A    I'm sorry?
21       Q    Do you know who placed it there?
22       A    No.
23       Q    And in this editorial, you refer to a
24   "pattern of the maladministration and misconduct

ADAM CROWN by MR. SHAHAN

1      --"

2          A    Yes.

3          Q    "-- which has run rampant in the fire

4      district in recent years."  Do you see where it

5      says that?

6          A    Where were you reading?

7          Q    Page 1, third paragraph.

8          A    Okay.  Go ahead, yes.

9          Q    That's something you wrote, correct?

10         A    That is right.

11         Q    Anyone in the fire district ever make any

12     effort to prevent you from writing that?

13         A    No.

14         Q    Anyone in the fire district ever make any

15     effort to take down your blog site other than

16     removing it from the fire department's website?

17         A    I don't know.

18         Q    Was there ever any attempts to take down

19     your blog?

20         A    I don't know.

21         Q    None that you're aware of?

22         A    None that I'm aware of.

23         Q    Since leaving the Danby Fire Department,

24     have you made any efforts to join the other fire

ADAM CROWN by MR. SHAHAN                                    65

1    companies?

2          A    Yes.

3          Q    What fire companies have you attempted to

4    join, if any?

5          A    Slaterville Springs.

6          Q    Where is Slaterville Springs located?

7          A    South of Ithaca.

8          Q    How far from your home?

9          A    Approximately five to six miles.

10         Q    Did you fill out an application?

11         A    Yes.

12         Q    What was the result of your application?

13         A    My membership was declined.

14         Q    Was it declined by a vote of the company

15   or was it declined by a membership committee?

16         A    I don't know.

17         Q    Did you ever find out why it was

18   declined?

19         A    I'm sorry?

20         Q    Did you ever find out why it was

21   declined?

22         A    No.

23         Q    Did you fill out any other applications?

24         A    No.

ADAM CROWN by MR. SHAHAN                          66

1       Q    Who provides fire, first response fire

2    service to your address?

3       A    Danby Fire Department.

4       Q    Do you know whether or not they contract

5    that out to Brooktondale?

6       A    Yes, they subcontract to Brooktondale.

7       Q    Did you ever attempt to join the

8    Brooktondale Fire Department?

9       A    No.  Actually, come to think of it, I did

10   go to Brooktondale.

11      Q    Did you fill out an application?

12      A    I don't remember, but I did go over and

13   talk to the chief and get a tour of the station

14   and that sort of thing.

15      Q    Okay.  Can you tell me how you have been

16   caused to suffer humiliation?

17      A    I'm sorry?

18      Q    Can you explain to me how you have been

19   caused to suffer humiliation?

20      A    Being accused of something I was innocent

21   of is humiliating.

22      Q    Any other reason?

23      A    I don't know.

24      Q    How about anguish?

ADAM CROWN by MR. SHAHAN                                    67

1     A     I'm sorry, what's your question?

2     Q     How about anguish; how have you been

3   caused to suffer anguish?  What anguish have you

4   suffered?

5     A     Extensive loss of sleep.

6     Q     When did you suffer extensive loss of

7   sleep?

8     A     Starting around 2009.

9     Q     What was the cause of your loss of sleep?

10    A     I was worried about the things that were

11  going on at the fire department.

12    Q     Can you be a little more specific about

13  those things going on with the fire department?

14    A     I'm not sure how to be more specific.

15    Q     If you can't be more specific, you can't

16  be more specific.

17    A     I knew that not having a good fire and

18  rescue company was putting a community at

19  unnecessary risk.

20    Q     Were you aware --

21    A     And --

22    Q     Go ahead.  I'm sorry.

23    A     I was concerned that some person or one

24  of my colleagues in the fire company would be

ADAM CROWN by MR. SHAHAN                            68

1    injured, or worse, and that's the only way I was

2    going to prevent that was to confront the

3    management of the fire company.  And I knew I was

4    going to take a lot of flack for that if I did.

5    That's just off the top of my head.

6        Q     And this was starting in 2009?

7        A     I beg your pardon?

8        Q     This was starting in 2009?

9        A     Yes.

10       Q     Were you aware of any member of the

11   public who has been injured as a result of a

12   failure in the event of the Danby Fire Company?

13       A     No.

14       Q     No one has ever told you they have been

15   injured as a result of the Danby Fire Company?

16       A     Outside of the company?

17       Q     Correct.

18       A     No.

19       Q     Has anyone ever filed a lawsuit against

20   the Danby Fire Company that alleged negligence

21   that caused harm?

22       A     I don't know.

23       Q     Has anyone ever made complaints, to your

24   knowledge, to the Department of Health they were

ADAM CROWN by MR. SHAHAN                               69

1    caused harm by the Danby Fire Company?

2         A    Not to my knowledge.

3         Q    Anyone ever make a complaint to you their

4    house was caused to be more damaged than it need

5    be by a fire as a result of the actions of the

6    Danby Fire Company?

7         A    No.

8         Q    Anyone ever tell you that they were

9    suffering an exacerbation of an injury in a motor

10   vehicle accident because of some conduct of the

11   Danby Fire Company?

12        A    No.

13        Q    According to your complaint, paragraph

14   17, you ---

15        A    I'm sorry, I can't hear.

16        Q    According to your complaint, paragraph

17   17, you went door-to-door speaking to people,

18   handed out flyers and sent e-mails as part of

19   your two campaigns for election to the District

20   Board of Commissioners?

21        A    Yes.

22        Q    Do you see where it says that?  Does that

23   refresh your recollection with regard to when you

24   ran for a position as a commissioner?

ADAM CROWN by MR. SHAHAN                                    70

1        A     Yes.

2        Q     Was that 2008 and 2009?

3        A     That is correct.

4        Q     And you were unsuccessful in both

5    occasions?

6        A     That is correct.

7        Q     And anybody at the Danby Fire District

8    ever prevent you from going door-to-door?

9        A     No.

10        Q     Anybody from the Danby Fire District ever

11    prevent you from handing out flyers?

12        A     No.

13        Q     Anybody from the Danby Fire District ever

14    impede your campaign in any way?

15        A     No.

16        Q     Anybody that you're aware of?

17        A     No.

18        Q     Anybody ever come to and you tell you

19    they felt your campaign was being impeded by the

20    Danby fire commissioners?

21        A     No.

22              MR. SHAHAN:  Those are all of the

23          questions I have right now.  I'm going to

24          let Mr. Hannigan ask you questions, and I'm

ADAM CROWN by MR. HANNIGAN                                71

1          going to go through my notes and make sure

2          I didn't forget anything.

3     EXAMINATION BY

4     MR. HANNIGAN:

5          Q    Good afternoon, Mr. Crown, my name is

6     Terry Hannigan.  I represent Mark Butler in

7     connection with a lawsuit you brought.

8               Same admonitions go, if you don't

9     understand a question, bring it to my attention,

10    I'd be happy to repeat it or rephrase it.  If you

11    do answer a question I'm going to assume, I think

12    it's fair we all assume, you understood the

13    question.  If you need the question repeated,

14    I'll be happy to do that for you.

15              If you need to speak with Mr. Isseks at

16    any point, bring it to my attention.  You're not

17    entitled to take a break to speak to him between

18    a question and answer, all right?  Do you

19    understand what I'm saying?

20         A    Yes.

21         Q    Okay.  Who was it that you ran against

22    unsuccessfully in 2008?

23         A    I don't remember.  I think it was Richard

24    Oltz.

ADAM CROWN by MR. HANNIGAN                                72

1    Q    Okay.  How about in 2009, who did you run

2    against unsuccessfully then?

3    A    I don't remember.  Actually Richard Oltz

4    may have been 2009, I don't remember which is

5    which.

6    Q    Okay.  Now you joined the fire service in

7    2007; is that correct?

8    A    That is correct.

9    Q    And the Danby Fire Company was the first

10   of fire companies you were ever affiliated with;

11   is that correct?

12   A    Yes.

13   Q    Did you know what time of year it was in

14   2007 when you joined?

15   A    January.

16   Q    And when did you complete Firefighter 1?

17   A    I'm sorry?

18   Q    When did you complete your Firefighter I

19   training?

20   A    I believe it was in April.

21   Q    Of 2007?

22   A    Yes.

23   Q    When does the Danby Fire Company conduct

24   its company elections and nominations as chief?

ADAM CROWN by MR. HANNIGAN                          73

1        A    December usually.

2        Q    Summer?

3        A    December.

4        Q    Oh, December.  Okay.  Did you run for

5    office on a company level in December 2007?

6        A    No.

7        Q    Did you ever hold office, either civil or

8    line officer office, in the Danby Fire Company?

9        A    No.

10       Q    Did you ever run for civil or line

11   officer office?

12       A    No, I don't think so.

13       Q    Now, who was -- I apologize, I'm a little

14   confused with my recording of some of your

15   answers.

16            Was Ms. Truttman a member of the Danby

17   Fire Company before you became a member?

18       A    No.

19       Q    To gain membership to the Danby Fire

20   Company, do you have to be sponsored by a member?

21       A    I don't think so.

22       Q    Do you have to have a reference?  Does

23   the application require references from current

24   members of the Danby Fire Company?

ADAM CROWN by MR. HANNIGAN                    74

1      A    I don't remember.

2      Q    Did you object to Ms. Truttman's

3  obtaining membership when she first made

4  application?

5      A    No.

6      Q    Did you object to Ms. Truttman's

7  completion of her -- withdrawn.

8           Did you object to Ms. Truttman becoming a

9  full member after the completion of her

10 probationary period?

11     A    Yes.

12     Q    You say it was a six-month probationary

13 period?

14     A    I think that's correct.

15     Q    And I'm looking at Exhibit 3, which is an

16 e-mail from you to Mr. Borden; is that correct?

17     A    Yes.

18     Q    And what's the date of that e-mail?

19     A    April 20, 2008.

20     Q    Now, is that contemporaneous with the

21 time of the vote on Ms. Truttman to come off of

22 probation and become a full-fledged member of the

23 Danby Fire Company?

24     A    Yes.

ADAM CROWN by MR. HANNIGAN                                    75

1      Q   Can you tell me or estimate within reason

2   how long was it before or after Ms. Truttman came

3   off probation that that e-mail was written?

4      A   I don't recall.  I would guess it would

5   be pretty close to the time of the meeting.

6      Q   Are we talking days or weeks?

7      A   Days, I would guess.

8      Q   And in April of 2008, your relationship

9   with Ms. Truttman had already debased itself to a

10  point where you were no longer business partners;

11  is that correct?

12     A   We were never business partners, we were

13  involved in a not-for-profit corporation.

14     Q   Well, were you involved in an endeavor

15  with the Common Horse Sanctuary?

16     A   Yes.

17     Q   Do you consider that something other than

18  a business pursuit?

19     A   Well, it's not-for-profit.

20     Q   So, you would call it a not-for-profit

21  pursuit?

22     A   Yes.

23     Q   Had your relationship with Ms. Truttman

24  over the not-for-profit pursuant debased itself

ADAM CROWN by MR. HANNIGAN                    76

1    by 2008?

2         A    I don't understand your question.

3         Q    Do you understand the word debased?

4         A    I'm not sure what you mean by it.

5         Q    At some point in time you and Ms.

6    Truttman had a relationship concerning a

7    not-for-profit venture; is that correct?

8         A    That is correct.

9         Q    You had some understanding, contractual

10   or otherwise, did you not?

11        A    Yes.

12        Q    And at some point in time that

13   relationship ended; is that fair?

14        A    Yes, that's correct.

15        Q    Did that relationship with the

16   not-for-profit venture end before April 2008?

17        A    No.

18        Q    As of April 2008, were the two of you

19   involved in the venture to make the recording?

20        A    No, I don't think so.

21        Q    Had that ended before April 2008?

22        A    Yes.

23        Q    Were you still, were the two of you still

24   involved in the Common Horse Sanctuary in April

ADAM CROWN by MR. HANNIGAN                    77

1    2008?

2         A    I'm not sure when it really terminated.

3         Q    Is there a date or an event you would

4    look to see when the relationship terminated?

5         A    I could check our reports.

6         Q    What would you be looking for?

7         A    Minutes of our meetings.

8         Q    You're not-for-profit corporations had

9    meetings?

10        A    Yes.

11        Q    How frequently or infrequently did you

12   have meetings?

13        A    Very infrequently.  I don't remember

14   exactly.

15        Q    Did your not-for-profit corporation file

16   IRS 990 returns?

17        A    I'd have to check with our secretary.

18        Q    Who is your secretary?

19        A    (Indicating).

20        Q    You have to verbalize.

21        A    My wife.

22        Q    Can you identify her for the record?

23        A    Kathleen Crown.

24        Q    How many directors were there?

ADAM CROWN by MR. HANNIGAN                              78

1      A    Three.

2      Q    Yourself, your wife and Ms. Truttman?

3      A    That is correct.

4      Q    Were there any other officers or

5      shareholders of the corporation?

6      A    No.

7      Q    Were there any employees of the

8      corporation?

9      A    No.

10     Q    Did you dissolve the corporation at some

11     point?

12     A    No.

13     Q    You indicate, I believe, in response to a

14     question Mr. Shahan asked you, that you had

15     discussion with Simon Wyatt and told him about

16     contradictions in Ms. Truttman's behavior?

17     A    Yes.

18     Q    Do you remember an answer to that effect?

19     A    Yes.

20     Q    Did I fairly repitulate that?

21     A    That's fine.

22     Q    What were the contradictions in her

23     behavior you told Mr. Wyatt about?

24     A    I pointed out times when she lied about

ADAM CROWN by MR. HANNIGAN                              79

1    things.  I pointed out times when she failed to

2    keep her word on things.

3        Q    Did that relate to fire company or fire

4    department business?

5        A    Some of them.

6        Q    Give me an example of one.

7        A    I'm sorry, it's been a long time, I might

8    have to look that up in my notes.

9        Q    What would you be looking at to reference

10   that?

11       A    E-mails to see if I had anything that I

12   sent to Simon.

13       Q    Did you have a similar discussion --

14   sorry.

15            Did you have a similar communication with

16   Linda Wyatt concerning Ms. Truttman's behavior?

17       A    Yes.

18       Q    Did you have communications with anybody

19   other than Simon Wyatt and Linda Wyatt about Ms.

20   Truttman's contradictions in her behavior?

21       A    Yes.

22       Q    To whom?

23       A    With my wife.

24       Q    Anyone else?

ADAM CROWN by MR. HANNIGAN                                    80

1      A    Sarah Wyatt.

2      Q    Sarah Wyatt?

3      A    Sarah Wyatt.

4      Q    Sarah Wyatt, I'm sorry.

5      A    And I think Tim Wyatt.  Let me think, is

6   there anything else.  I don't recall anyone else.

7      Q    Before you came here today, had you ever

8   seen Crown Exhibit 2, which is the letter

9   authored by Simon Wyatt?

10     A    I'm sorry, what was your question?

11     Q    Before you came here today, have you ever

12  seen that?

13     A    This letter (indicating)?

14     Q    That is Exhibit 2.

15     A    No.  No.

16     Q    Do you know generally what the subject

17  matter of that letter is, having read it today?

18     A    Not really.

19     Q    Can you tell from your own review of that

20  letter whether Mr. Wyatt is endorsing or opposing

21  Ms. Truttman's application?

22     A    He seems to be endorsing Ms. Truttman.

23     Q    Is there any doubt in your mind that

24  letter relates to Ms. Truttman and her membership

ADAM CROWN by MR. HANNIGAN                                    81

1    in the Danby Fire Company in coming off the

2    probationary period?

3        A    No.   It appears to be directed towards

4    that.

5        Q    You understand -- withdrawn.

6             It's your understanding that, and it was

7    your experience, was it not, that after six

8    months of probationary membership, the membership

9    would again vote on whether a particular person

10   should remain a member of the Danby Fire Company?

11       A    Yes.

12       Q    When was the first time you met Mark

13   Butler?

14       A    He taught a class called legal issues in

15   the fire service that I attended.

16       Q    Where did you take that?

17       A    At the fire academy in Montour Falls.

18       Q    When did you take that?

19       A    I don't recall the date.

20       Q    Was it in 2007, your first year?

21       A    I'm sorry, I don't remember.

22       Q    Do you know if it was before or after the

23   first time you ran for commissioner?

24       A    I don't remember.

ADAM CROWN by MR. HANNIGAN                                    82

1      Q    Do you know how long the course was, how

2    long it took?

3      A    I don't recall.  I think it was either a

4    one or two-day course.

5      Q    And as part of that course, did Mr.

6    Butler ask you to, in the very beginning of the

7    course, identify yourself, your fire department

8    membership and how many years you have been

9    involved in the fire service?

10     A    I don't remember, probably.

11     Q    Do you have any idea what your response

12   was with respect to how many years you have been

13   in the fire service, when and if you were asked

14   that question?

15     A    No.

16     Q    Did you take legal issues before or after

17   you completed Firefighter I?

18     A    It was after.

19     Q    Did you take it before or after you

20   completed Fire Officer 1?

21     A    I don't remember.

22     Q    Did you ever take a course called

23   Introduction to Fire Officer?

24     A    Yes.

ADAM CROWN by MR. HANNIGAN                                    83

1      Q    And you didn't mention that in the
2   listing of courses.
3      A    Sorry.
4      Q    You took Intro to Officer and you took
5   Fire Officer I?
6      A    Yes.
7      Q    Where did you take Intro to Fire Officer?
8      A    That was at the local --
9      Q    Was that at the county?
10     A    Yes.
11     Q    The county training facility for what
12   county?
13     A    Tompkins County.
14     Q    And where did you take Fire Officer II?
15     A    At the academy.
16     Q    That's the Academy of Fire Science in
17   Montour Falls?
18     A    That is correct.
19     Q    What county is that in?
20     A    I don't know.
21     Q    Is it in Tompkins County?
22     A    I don't know.
23     Q    Where did you take fire investigation?
24     A    At the academy.

ADAM CROWN by MR. HANNIGAN                          84

1       Q    How about truck company ops, operations?

2       A    That was county.

3       Q    Calling Mayday?

4       A    County.

5       Q    Building construction?

6       A    County.

7       Q    Was that noncombustible, building

8   construction noncombustible?

9       A    Yes.

10      Q    Do you have a copy of your training

11  record?

12      A    Yes.

13      Q    When was the last -- when was the last

14  course you took before you enrolled in Fire

15  Officer III?

16      A    Sorry, I don't remember.

17      Q    Can we agree you were enrolled in fire

18  officer in January 2010?

19      A    Yes.

20      Q    Did that course begin in January 2010?

21      A    I think so.

22      Q    Do you recall what the last county course

23  was that you took?

24      A    I don't recall.

ADAM CROWN by MR. HANNIGAN                                    85

1      Q    Did you take any training courses in
2   2009?
3      A    Yes.
4      Q    Do you know what course you took in 2009?
5      A    No, I'm sorry.
6      Q    I think you already, I may have been
7   mistaken, were you able to state when you took
8   legal issues?
9      A    No.
10     Q    You're not sure about that.  But you
11  definitely took it at the Academy of Fire
12  Science?
13     A    Correct.
14     Q    Is that the only course you took with
15  instructor Butler?
16     A    Yes.
17     Q    Did you have any communications with
18  Instructor Butler after the course was completed?
19     A    No.
20     Q    Did he, at the completion of the course,
21  did Instructor Butler give you an e-mail address
22  and phone number to contact him if you had any
23  questions?
24     A    No.

ADAM CROWN by MR. HANNIGAN                                    86

1      Q    At the time you took legal issues, were

2   you aware that Instructor Butler was the counsel

3   to the Danby Fire District?

4      A    No.

5      Q    When did you first become aware Mr.

6   Butler was counsel to Danby Fire District?

7      A    I don't remember.  His name was on a

8   legal document representing the district, maybe

9   it was something they sent me.  I don't remember,

10  it was sometime later.

11     Q    Take a look at Exhibit 10, if you would.

12  I apologize having to shuffle paper across the

13  table.

14     A    That's fine.

15     Q    Were you aware that Mr. Butler was

16  counsel to the fire district before March of, the

17  March 14, 2010 e-mail from Diana Bowles?

18     A    I might have been.

19     Q    You received the e-mail from Ms. Bowles,

20  that's Exhibit 10?

21     A    That is correct.

22     Q    Did you ever file a complaint against Mr.

23  Butler with 8th Judicial District?

24     A    Oh, i wonder if that's -- I'm not sure.

ADAM CROWN by MR. HANNIGAN                                    87

1      Q    Did you ever file a complaint with Mr.

2   Butler with some type of oversight agency with

3   attorneys and judges?

4      A    Yes.

5      Q    When did you do that?

6      A    Subsequent to the events of March 23,

7   2010.

8      Q    Did Mr. Butler ever represent you in a

9   legal capacity?

10      A    No.

11      Q    What was your basis for the complaint

12   with the determining oversight committee?

13      A    I don't recall the details right offhand,

14   I can produce that for you if you'd like.

15      Q    Generally, what was the nature of your

16   complaint?

17      A    That he did not conduct himself

18   according, with their standards in terms of his

19   relationship with me at the March 23, 2010

20   meeting.

21      Q    And what specifically did you contend --

22   withdrawn.

23           How was it that you state he did not

24   comport with the Standards of Professional

ADAM CROWN by MR. HANNIGAN                                    88

1    Conduct in the review?

2        A    The one thing that I recall specifically

3    is that I believe it states attorneys are not

4    allowed to use the threat of criminal charges as

5    leverage in a civil manner.  And so that one I

6    remember exactly.

7             I went through their code and that's what

8    I found there.

9        Q    You did some research with respect to the

10   Code of Professional Responsibility or whatever

11   the ethical code was at the time?

12       A    I read it.

13       Q    Have you had some training as a paralegal

14   then?

15       A    That came later, that's --

16       Q    And in fact, some of your correspondence,

17   for example, Exhibit 12, you cite statutory

18   authority, do you not?

19       A    Yes.

20       Q    And is that as a result of research you

21   did?

22       A    Yes.

23       Q    What's the date on that correspondence?

24       A    March 12, 2009.

ADAM CROWN by MR. HANNIGAN                                    89

1      Q    That was a year before your dealings with

2  Mr. Butler; is that right?

3      A    I'm sorry.  I'm not sure what you mean.

4      Q    Your first encounter with Mr. Butler,

5  other than an educational setting, was in March

6  of 2010; is that correct?

7      A    That is correct.

8      Q    March of 2009, at least through what we

9  have before us is Exhibit 10 -- that is 10,

10  right?

11     A    12.

12     Q    12, I'm sorry.  There's some indicia you

13  had some ability to research and cite authority;

14  is that correct?

15     A    That is correct.

16     Q    And in fact, Exhibit 16, which was your

17  e-mail exchange with Chief Gaden, you also cited

18  the New York State Town Law with respect to the

19  authority of chiefs; isn't that right?

20     A    That is correct.

21     Q    And as I read Exhibit 16, in the second

22  -- I believe it's the second paragraph from the

23  bottom.  You request that the chief provide you

24  with a notice of charges?

ADAM CROWN by MR. HANNIGAN                                    90

1       A    Yes.

2       Q    And was that done on March the 23, 2010?

3       A    Yes.

4       Q    And what's the date of that e-mail to

5    Chief Gaden?

6       A    March 10, 2010.

7       Q    Now, when you arrived at the firehouse on

8    March 23rd, was the meeting of the Board of Fire

9    Commissioners already in session?

10      A    I don't recall.

11      Q    Had you attended meetings of the Board of

12   Fire Commissioners on prior occasions?

13      A    Yes.

14      Q    How generally do they commence the

15   meetings?

16      A    I'm not sure I can say.

17      Q    Does the chairman call the meeting to

18   order?

19      A    Yes.

20      Q    And do you know if you were at the

21   meeting on March 23rd when the chairman called

22   the meeting to order?

23      A    I think I was, yes.

24      Q    And then at some point did that meeting

ADAM CROWN by MR. HANNIGAN

91

1    retire into executive session?

2        A    Yes.

3        Q    Were you invited into the executive

4    session?

5        A    Yes.

6        Q    Were you given explanation as to why the

7    board was retiring to executive session?

8        A    No.

9        Q    Did you understand when they were going

10   into executive session it was to discuss the

11   matter of the charges against you?

12       A    Yes.

13       Q    And were you aware of that -- withdrawn.

14            Anybody besides you go into executive

15   session, besides you and the board, with Mr.

16   Butler?

17       A    Not to my knowledge.

18       Q    When you went into executive session, did

19   the board, when the board went into executive

20   session, did they leave the meeting room where

21   the meeting customarily was held and go into

22   another room?

23       A    Yes.

24       Q    And you went with them?

ADAM CROWN by MR. HANNIGAN

92

1     A   Yes.

2     Q   And was it at that point in time you

3  produced a recorder to record the executive

4  session?

5     A   Pretty much.

6     Q   And were you told they don't record

7  executive sessions, recording is not permitted?

8     A   Yes.

9     Q   Did Mr. Butler tell you that?

10    A   Yes.

11    Q   Did he tell you that's a matter of

12  policy, the district doesn't allow tape recording

13  of executive sessions?

14    A   I believe that's what he said.

15    Q   Did you accept that explanation?

16    A   I'm not sure what you mean.

17    Q   Did you turn off the recorder at that

18  point in time?

19    A   Yes.

20    Q   And based upon your training and legal

21  issues with the fire service, are you aware the

22  Board of Fire Commissioners has the authority to

23  set rules and policies of the fire company?

24    A   Yes.

ADAM CROWN by MR. HANNIGAN

93

1      Q    Did you accept the fact that the board,

2   as a matter of policy, does not allow recording

3   in executive session as one of those policies?

4      A    Did I accept it?

5      Q    Did you accept it, did you understand

6   that to be the case?

7      A    I know I understood that, yes.

8      Q    I think you indicated that during the

9   course of the executive session, you were

10  presented with the charges; is that correct?

11     A    That is correct.

12     Q    And then did the board then return to the

13  regular meeting?

14     A    Yes.

15     Q    Did you have any discussion with any of

16  the board members before they left executive

17  session and returned to the regular meeting?

18     A    No.

19     Q    Did you have a discussion with Mr. Butler

20  in the presence of the board before they returned

21  to the regular meeting?

22     A    I don't think so.

23     Q    Did you, during the course of the

24  executive session, were you given the charges and

ADAM CROWN by MR. HANNIGAN                              94

1    the notice of hearing, which are Exhibit 11?

2              MR. HANNIGAN:  Is that the notice of

3         hearing?

4              MR. SHAHAN:  Yep.

5              MR. HANNIGAN:  Is that the charges,

6         too?

7              MR. SHAHAN:  Yep.

8    A    I'm sorry.  What's the question again?

9    Q    During the course of executive session,

10   were you given a copy of Exhibit 11?

11   A    Yes.

12   Q    Did you review it in executive session?

13   A    Did I review it?

14   Q    Did you personally review it?

15   A    Yes.

16   Q    At any point in that evening, did you

17   show it to Linda Wyatt?

18   A    I don't recall.

19   Q    At any point in that evening, did you

20   read it to your wife over the phone or otherwise?

21   A    I don't recall.

22   Q    Did you discuss the matter of what was

23   contained in the notice of charges or statement

24   of charges and the notice of hearing with anybody

ADAM CROWN by MR. HANNIGAN                    95

1    other than Linda Wyatt and your wife that

2    evening?

3         A    No.

4         Q    Where did you have your discussion with

5    Linda Wyatt?

6         A    In the corridor between the general

7    meeting room and the room we held the executive

8    session.

9         Q    Was Linda Wyatt waiting outside of the

10   room where the executive session was when the

11   door was open?

12        A    I don't know.

13        Q    Did she ever say she was attempting to

14   listen to what was going on in executive session?

15        A    1 don't recall.

16        Q    Did she ever tell you that?

17        A    I don't think so.

18        Q    After the board returned to the regular

19   meeting, did you remain and have a discussion

20   with Mr. Butler?

21        A    I'm sorry?

22        Q    After the board returned to the regular

23   meeting, did you remain in the conference room

24   and have a discussion with Mr. Butler?

ADAM CROWN by MR. HANNIGAN

96

1      A   Yes.

2      Q   And did Mr. Butler say anything to you

3   about the manner about what change is effected in

4   the fire service?

5      A   I'm sorry.

6      Q   Did Mr. Butler have any discussion with

7   you as to how change is effected in the fire

8   service?

9      A   Yes.

10     Q   And what do you recall him saying

11  specifically?

12     A   I think he said that, no, wait, I don't

13  want to misremember this.  He said I had

14  alienated too many people.

15     Q   Did he say anything about change being

16  effected in a participatory, rather than

17  adversarial, confrontational fashion?

18     A   No.

19     Q   Did he say anything to you about

20  effecting change in a participatory and

21  contributory fashion, rather than a

22  confrontational and challenging fashion?

23     A   No.

24     Q   Did you ask Mr. Butler what was going to

ADAM CROWN by MR. HANNIGAN                           97

1    happen if the charges were levied?

2         A    I'm sorry?

3         Q    Did you ask Mr. Butler what was going to

4    happen if the charges were levied against you?

5         A    No, not really.

6         Q    Did you understand what the process was

7    once the initiation of charges was levied?

8         A    Yes.

9         Q    That necessarily involved a hearing?

10        A    You're talking about the departmental

11   charges?

12        Q    I'm talking about the district's charges,

13   the ones in your hand.

14        A    It's 11.

15        Q    11.  Did you know what the process was?

16        A    Yes.

17        Q    Had you actually -- had that been part of

18   the curriculum of legal issues when you took it

19   at the fire academy?

20        A    No.

21        Q    Was there any instruction at all on

22   209(L), General Municipal Law 209(L), in the

23   Legal Issues I curriculum?

24        A    I don't recall spending very much time on

ADAM CROWN by MR. HANNIGAN

98

1    it, no.

2        Q    Do you remember spending any time on it?

3        A    I can't recall.

4        Q    Did you know that evening, the evening of

5    March 23rd, you would be entitled to hearing?

6        A    Did I know that at the time?

7        Q    Yes.

8        A    Yes.

9        Q    Did you know you would be entitled to be

10   represented by counsel?

11       A    Yes.

12       Q    And did you know you would be entitled to

13   call witnesses?

14       A    Yes.

15       Q    You understood this during the course of

16   the executive session, or the period of time you

17   were meeting with Mr. Butler; is that right?

18       A    Yes.

19       Q    Yet, at some point in time you opted to

20   resign instead of going forth with the hearing;

21   is that right?

22       A    No.

23       Q    You did not agree to resign on March

24   23rd?

ADAM CROWN by MR. HANNIGAN

99

1     A     That's not why I agreed to resign.

2     Q     Did you agree to resign on March 23,

3     2010?

4     A     I signed a document.

5     Q     Was that document a resignation?

6     A     It was.

7     Q     And did you submit that resignation to

8     the Board of Fire Commissioners as your

9     resignation from the fire district.

10    A     Yes.

11    Q     And it bears your signature; is that

12    right?

13    A     Yes.

14    Q     And there was a handwritten change, I

15    think you attributed to Mr. Butler, that

16    indicated, in words or substance, the resignation

17    would not affect your ability to run for fire

18    commissioner at any time in the future; is that

19    correct?

20    A     That is correct.

21    Q     That's a change you requested?

22    A     No.

23    Q     Was being able to run for fire

24    commissioner a concern you raised in your meeting