with Mr. Butler?

A No, not a concern.

Q Is it something he came up with all by himself?

A No.

Q How did it come about that that handwritten addendum or change was made in the letter?

A I told him this wasn't going to prevent me from running for fire commissioner because he didn't have that authority. He said, I'll write it as a change.

Q Did you initial the change?

A Yes, I did.

Q And you signed the resignation letter, correct?

A That is correct.

Q And you were aware, as of the evening of March 23, 2010, your resignation with the department really had no bearing on your ability to run for commissioner?

A I'm sorry?

Q Resigning from the fire department on March 23, 2010 had no bearing on your ability to

run for fire commissioner in the future?

A That is correct.

Q And in fact you told Mr. Butler the resignation had no bearing in that regard?

A That is correct.

Q Did Mr. Butler express to you he was representing your interests on the night of March 23, 2010?

A Not specifically, no.

Q Did he indicate he was representing the Board of Fire Commissioners that evening?

A Yes.

Q And you understood that he would be the attorney prosecuting the charges against you before a hearing officer?

A At some point I did, yes.

Q Had you retained an attorney as March 23, 2010?

A No.

Q Why was it you opted to resign instead of going forward with the charges that you requested in your e-mail to Chief Gaden?

A Sorry?

Q Why was it that you opted to resign

instead of going forward with the charges that you requested be provided to you in your e-mail, which is Exhibit 16?

A Mr. Butler said I would be charged with criminal charges if I did not resign.

Q What do the charges in the -- withdrawn.

Did the charges, that are Exhibit 11, make any allegations of criminal conduct?

MR. ISSEKS: Objection to form of the question. It calls for a legal opinion. You can answer it.

A I'm sorry, what exactly was the question again?

Q In the statement of charges, or in the notice of hearing, statement of charges, Exhibit 11, is there any reference to criminal conduct?

MR. ISSEKS: Same objection.

A Not specifically, no. I don't think.

Q Take your time and take a look at it. If you see anything in there that alleges criminal conduct, please bring it to my attention.

A I'd have to say I don't know.

Q Have you reviewed the statement, the charges that are Exhibit 11?

A Yes.
Q And you don't know whether there's anything there that makes an allegation of criminal conduct or criminal charges against you?
A I'm not sure.
Q Was there any discussion about your filing the PESH complaint at the executive session or in the meeting with Mr. Butler on March 23, 2010?
A No.
Q Was there any discussion about you filing a PESH complaint at the general meeting of the Board of Fire Commissioners in the regular meeting on March 23, 2010?
A No.
Q Was anything stated to you about any member of the Board of Fire Commissioners that they were aware that a PESH complaint had been filed as of March 23, 2010?
A No.
Q Was it your understanding, did you believe they were unaware you filed a complaint?
A I don't know.
Q Did you tell them you filed a complaint?

A No.

Q I want to be specific. On March 23, 2010, did you inform the Board of Fire Commissioners, or Mr. Butler, you had previously filed a complaint with PESH concerning the fire department or fire district?

A No.

Q Same answer with fire district?

A That is correct, no.

Q As of March 23, 2010, had you been contacted by PESH concerning your complaint?

A I'm not sure.

Q Who was the first person you had contact with at PESH over your complaint?

A I'm not sure who the first person was.

Q Was it a man or woman?

A Man.

Q Was it a man from the Syracuse office, Binghamton office, someplace else?

A I don't remember.

Q Was the person an investigator, clerical person, administrator?

A I don't know who fielded the call.

Q Was it a call that is made by PESH to

you?

A I'm sorry?

Q Was that a call made by PESH to you or you to PESH?

A I'm lost on your question.

Q Okay. I wanted know about your first contact with PESH subsequent to the filing of the complaint, which is Exhibit 15. And in that first communication, whether it be verbal, written or otherwise, I want to know who you communicated with.

A After the 23rd?

Q No. After the PESH complaint was submitted.

A Oh, I spoke with an investigator.

Q Was that Mr. Capelli?

A Mr. Capelli, yes.

Q Do you know if that was before or after March 23, 2010?

A It was before.

Q How much, how long before?

A I don't know.

Q Did you tell Mr. Capelli you were going to -- were you requested to be at the Board of

Fire Commissioners meeting on March 23, 2010?

A I think that was that time, yes.

Q You think?

A I don't remember.

Q Do you have a diary or notes concerning your contact with PESH?

A Might have.

Q Do you have any reference in there about when you were contacted by Mr. Capelli?

A Might have.

Q And what would the document or documents be that you would look to to research whether or not you have a record of contact with Mr. Capelli or PESH?

A I'd have to look through my e-mails.

Q If you had contact with Mr. Capelli that wasn't in the form of an e-mail, would you have some other document or diary?

A Might have, yes.

Q Did you ever inform Linda Wyatt or anybody else of your contacts with PESH?

A Yes.

Q Did you provide a chronology to Linda Wyatt or someone else about your dealings with

PESH?

A I spoke to her about it.

Q Was there anybody else that you spoke to about the PESH complaint, other than Linda Wyatt, before March 23, 2010?

A My wife.

Q Anybody besides your wife?

A I don't recall.

Q Was the matter of the PESH complaint, or the matter of a PESH complaint, ever discussed in your presence on March 23, 2010 by any representative of the Board of Fire Commissioners or Mr. Butler?

A No.

Q In the course of your legal research with respect to issues in the fire service, did you ever research General Municipal Law 72-G that relates to out-of-county training?

A I think so.

Q And what's your understanding of that, of that statute?

A I don't recall. I'd have to look it up, I'd have to review it.

Q You have the wherewithal and ability to

look up that statute?

A Yes.

Q Do you have access to a statutory database or Lexus or something like that?

A No. I have the fire service manual, fire service law.

Q Fire service laws of the State of New York?

A I think it's in there.

Q What color is the book?

A Brown.

Q Is it something published by FASNY?

A I think so, yes.

Q Do you have the current issue of that?

A No, it's not current now.

Q Would you agree with me generally that General Municipal Law 72(G) requires authorization of the Board of Fire Commissioners for any out-of-county training?

A My understanding is it requires their permission if they're the ones paying for the training.

Q That's your understanding?

A Yes.

Q Do you know who provided VFBL or voluntary firefighter benefits coverage for you in 2009 or 2010?

A No.

Q Do you know if you were covered by FVBL in 2009 up through March 23, 2010?

A I don't know.

Q Were you on the active roster of Danby Fire Company up until March 23, 2010?

A Yes.

Q Does the term "authority having jurisdiction" have any meaning to you, if anything?

A It's the authority having jurisdiction over any particular matter.

Q Is that something you learned about in legal issues?

A We touched on that, yes.

Q What's your understanding, if you have one, as to who the authority -- who is the authority having jurisdiction in Danby Fire Department?

A Would be the Danby Fire Commissioners.

Q Are there any members of the Danby Fire

Department --

Were there any members of the Danby Fire Department in March of 2010 also, through their employment, affiliated with any law enforcement agency?

A I don't know.

Q In your complaint you allege that charges, paragraph 23 alleged that Butler told plaintiff defending himself would run into six figures; is that correct?

A That is correct.

Q And you also allege, if he, meaning you, wanted to speak to a lawyer, charges would be filed against you and they would have law enforcement there in minutes?

A Yes.

Q That's what he alleged?

A That is correct.

Q Did a law enforcement officer ever show up at the firehouse that night?

A No.

Q What was the nature of the criminal charges, or the potential criminal charges, as you understood them, with respect to your

conduct?

A Filing a false instrument.

Q What was the false instrument?

A My applications to the fire department.

Q Would that be the training authorization letter?

A No.

Q You said it was the applications?

A The applications.

Q And what was your understanding, if you had one, as to what the nature of the false instrument filing was with respect to those?

A He was, he was claiming that I had forged the chief's signature on the document.

Q Is that, in essence, the nature of the charges that are filed against you in Exhibit 11?

A I believe that's correct.

Q When was the last -- withdrawn. When was the last fire or EMS call you ran as a member of the Danby Fire District?

A I don't remember.

Q What was the last fire or EMS call you went out on in the Danby Fire District?

A It would have been in 2009.

Q When in 2009?
A In the fall.
Q Before the time you unsuccessfully ran for commissioner?
A I'm sorry?
Q Before the time you unsuccessfully ran for commissioner?
A Yes.
Q What was the call?
A I don't remember.
Q Do you know if it was fire, EMS or something else?
A No, sorry. I don't remember.
Q When was the last time you attended a training session of the Danby Fire Department before March 23, 2010?
A I don't know.
Q Was it in 2010?
A No.
Q Was it in 2009?
A Must have been 2009.
Q Sorry?
A 2009, I believe.
Q Did you say spring?

A I said I think it's 2009.
Q When in 2009 was that?
A I don't remember.
Q Did you attempt to avoid meetings and training sessions if you knew Christel Truttman was going to be there?
A No.
Q Now, in March of 2009, March of 2009, did you send what's marked as Exhibit 1 to the chairman of the Board of Fire Commissioners?
A Yes.
Q Did you ever run against Pat Caveney?
A I don't think so.
Q But in Exhibit 12, you reference a "Candidate A"; do you see that in the second paragraph on the first page?
A Yes.
Q Who is "Candidate A?"
A That would be Christel Truttman.
Q You first objected to her membership by your e-mail in April of 2008 directed to Mr. Ross?
A Oh, Ross Borden?
Q Ross Borden, yes.

A No.

Q When did you first object to her?

A At the meeting.

Q The meeting where she was voted on?

A Yes.

Q And after that meeting you complained to Ross Borden about her being voted in after her probationary period; is that correct?

A I complained to him about her being voted in against the bylaws.

Q Was that April of 2008?

A Yes.

Q April of 2009 you wrote -- I'm sorry, March of 2009 you sent Exhibit 12 to the Board of Fire Commissioners; is that correct?

A That is correct.

Q Did you know at that point in time the Board of Fire Commissioners already approved Ms. Truttman to be a member of the fire department?

A I believe so, yes.

Q Do you know when it was they approved her membership?

A No.

Q Do you know if it was before or after her

probationary period?

A I don't know.

Q What was the purpose of you writing Exhibit 12?

A I was bringing the problem to the attention of the fire commissioners.

Q What was the problem?

A The company wasn't following its bylaws.

Q In legal issues, did you learn the distinction between the fire company and the Board of Fire Commissioners?

A Yes.

Q Did you understand membership was an issue of the fire company?

A Yes.

Q What was the purpose then to your bringing this matter, near 11 months later, to the attention of the Board of Fire Commissioners?

A I was hoping they would find some way to address that problem.

Q And find some way to throw Christel Truttman out of the fire department?

A No. To make the fire company follow its bylaws.

Q Was your goal to have Christel Truttman's membership, have her removed from membership of the fire company?
A No.
Q Who is "Member B?"
A Let me see. That was me.
Q Now, on page, it appears to be 6, but it's unnumbered on the copy that I have.
A I have got it.
Q Is it unnumbered on yours as well?
A Yes.
Q Numbers 1 through 5 and 7 are numbered but 6 is not?
A That is correct.
Q Talking about Exhibit 12.
You reference Town Law 176, is that correct, "Questions To Be Resolved"?
A Yes.
Q And you're talking about the authority of the Board of Fire Commissioners; is that right?
A Yes.
Q And number one, below that, you wanted to know when they approved Christel Truttman's membership and that her membership was contrary

to the bylaws; is that correct?

A That is correct.

Q And then at paragraph two, you wanted to know if they did not know that her membership was contrary to the bylaws, if there was some complicity on the part of the commissioners to not share that information; is that right?

A Or oversight.

Q Or oversight. Fair enough. But generally speaking you wanted to know what they knew at the time they approved her or what they didn't know at the time they approved her?

A Yes.

Q Do you know if there with a procedure by which they approved her membership a second time?

A I don't know.

Q Mr. Crown, what I would like you to do, on this Exhibit 7 there are several paragraphs, Exhibit 7 being the statement you filed with the Ithaca Police. I admittedly am having difficulty reading your handwriting.

There are multiple pages here. If you can read the declaration paragraphs where it says: "I declare that the following voluntary

statements --" and there appear to be paragraphs, they're in your handwriting?

A Yes.

Q Would you read those into the record? I do not need the attestation at the bottom or the introduction, but I would like you to read the declaratory paragraphs.

A Okay.

Q And please, for the benefit of our reporter, go nice and slow.

A You think you have trouble reading my handwriting. Let's see.

"New York Penal Law, Section 210.15, perjury in the first degree states: A person is guilty of perjury in the first degree when he answers falsely and when his false statement, A, consists of testimony, and B, is material to the action proceedings or matter in which it is made. Perjury in the first degree is a Class D felony.

"On May 21 of 2009, Ms. Christel S. Truttman, the defendant in Crown v. Truttman, in a Small Claims case for breach of contract, knowingly and intentionally made false statements, A, consisting of testimony that was

B, material to the proceeding, thereby committing the crime of perjury as described in NYPL 210.15 and for which crime I ask that she be charged.

"In Ms. Truttman's testimony, she stated that I engaged in a quote, series of harassment, unquote, parenthesis, transcript page 20, line 10, closed parenthesis, consisting of five things.

"One, that I had taken a pony for which she had paid. Two, that her mother, Ms. Olivia Vent, had been a director of the not-for-profit corporation Common Horse Sanctuary, of which Ms. Truttman and I were two of the directors. Three, I acted with questionable legal authority in voting Ms. Truttman to be removed from the board of directors. Four, that I had made a quote, unquote, bogus complaint about her to the SPCA. Five, that I had improperly attempted to negatively influence her participation in the Danby Volunteer Fire Company.

"This is not an exhaustive list of the false statements Ms. Truttman made in her testimony, only the ones which I believe can and -- can readily be proven to have been false. The

particulars are as follows: One, Ms. Truttman swore that I had wrongly taken from her a pony, parenthesis, Jimmy, closed parenthesis, for which she had paid, parenthesis, transcript page 21, line 3. Quote, he took away a horse that I had paid for, unquote.

"The facts are these: In February of 2007 Ms. Truttman solicited my wife, Kathleen, and I to help her form a not-for-profit corporation for the purpose of developing a horse rescue and rehabilitation facility which was to be operated, at least for the present, on the premises of Ms. Truttman's mother, Ms. Olivia Vent, who owned a small farm at 194 East Miller Road in Ithaca, New York.

"The directors of the corporation were Ms. Truttman, myself --" oh, no. "-- were Ms. Truttman my wife and I. In March 2007, Ms. Truttman informed us that she had received information that a gelding pony, parenthesis, Jimmy, was about to be sent to auction and probably to slaughter. The CSHS, meaning Common Horse Sanctuary, directors decided if we could raise the money, CSHS would buy the pony and be

the organization's first rescue.

"Ms. Linda Wyatt donated $300 to CSHS to buy the pony and she gave the money to Ms. Truttman in cash, because quote, unquote, time was of the essence, according to Ms. Truttman's recommendations. My wife and I offered to donate $200, the exact amount was the $180. Ms. Truttman said she could donate $300. On April --" something before that I can't read, "-- on April 8, 2007, Ms. Truttman and I went to Beaver Dams to buy the pony along with Joe Blu (phonetic), whom I had hired to provide transport. Ms. Truttman and I met Ms. Linda Ettinger and bought from her the pony Jimmy on behalf of CSHS.

"Ms. Truttman and I were each acting as a director of CSHS as representative of and agents for our corporation and not as private individuals acting on our personal behalf. Ms. Truttman did not give Ms. Ettinger her own funds. Ms. Wyatt had donated nearly half the purchase price.

"The total acquisition cost of Jimmy was $830, parenthesis $650 purchase price and $180

transport, closed parenthesis. $350 was donated by Ms. Truttman, 42 percent, $300 was donated by Ms. Wyatt, 36 percent and $181 was donated by my wife and I, 21 percent.

"Together Ms. Wyatt and my wife and I donated $480, 57 percent of the $830 acquisition cost. As of April 8, 2007, the date CSHS acquired Jimmy. Ms. Truttman, as acting executive director, in quotes, had failed to open a bank account in the name of CSHS because, quote, time was of the essence, unquote. Ms. Wyatt gave her donations in cash, my wife and I paid for transport from our joint personal account and Ms. Truttman told us she wrote a personal check for her portion of the donations.

"The CSHS account was opened on April 13, 2007 at Cornell Federal Credit Union, parenthesis, account number 168269, closed parenthesis. During the period of April 2007 through January 2008, CSHS had deposits of $2,804.51. Of this amount $1,850, 55 percent, came from IFV, Incorporated, another not-for-profit, of which Ms. Wyatt, my wife and I are the directors.

IFV was to undertake a joint program with CSHS.

"$525 of this amount was to cover feed for Kelsey, a horse jointly owned by my wife and I and used in certain IFV activities, who was then living at 194 Miller road. The remainder of the $1,550 was for Jimmy's upkeep and general use by CSHS. These facts can be supported by Ms. Wyatt, my wife and by prior statements made by Ms. Truttman in various e-mails to Ms. Wyatt, my wife and to me.

"Ms. Truttman stated in her testimony that her mother, Ms. Olivia Vent, was at some time added to the board of directors at CSHS, parenthesis, transcript page 27, lines 8 through 25 and page 25, line 1 through 3, closed parenthesis. Quote, I said she was added, unquote. As shown on the certificate of incorporation, the initial three directors were Ms. Truttman, my wife, Kathleen Crown, and I. They are the only directors made on the application for the CSHS bank account.

"No meeting was held to approve bylaws or add any new directors, although many possible additional directors was discussed, Ms. Vent

among them. This assertion by Ms. Truttman is simply a lie. It's a claim that only came up when there was a question about the disposition of Jimmy. I do not know if Ms. Truttman also lied to Ms. Vent or whether the two of them are both lying.

"The evidence that they claim for their assertion is an unsigned document that appears to be a rough draft of a list of directors that includes Ms. Vent's name. The actual origin and purpose of this document are unknown and it has many deficits. Ms. Truttman had this explained to her many times, and I have more than once advised her to read the law for herself.

"After retaining an attorney with a not-for-profit speciality, I passed all of this information on to Ms. Truttman and I thought the matter had been resolved.

"Ms. Truttman stated that the CSHS board of directors --" God, I can't read that either. Oh, no, here it -- it says, "-- board of directors acted with questionable legal authority when we voted to remove her from the board, and states that our grounds for doing so were quote,

unquote, lies or false for which all directors share equal guilt, unquote, parenthesis, transcript page 20, lines 22 through 25, page 21, line 1, closed parenthesis.

"The truth is that it was Ms. Truttman who attempted to acquire ownership, control of corporate assets, the pony Jimmy, and use corporate funds for personal items, has retained property for her personal use that was purchased by the corporation, attempted to coerce the board members to let her have her way, falsely claimed her mother to be a director in order to gridlock the corporation, refused to comply with --" I can't make that out. There's word I can't make out. "-- with --" blank "-- standards of the corporation, et cetera."

What is that? I think it's horse-care standards of the corporation, et cetera.

"Our removal of Ms. Truttman was carried out in accordance with New York Not-For-Profit Law. This is supported by our minutes and various e-mails between the directors." Verbose fellow.

"Ms. Truttman stated that I had filed a

bogus complaint with the Tompkins County SPCA, transcript page 20, lines 21 through 22, closed parenthesis. As a last resort, with the pony Jimmy on Ms. Truttman's premises and with Ms. Truttman refusing to muck out shelter areas as previously agreed upon, as specified and specifically requested by two-thirds of the board members, I asked the SPCA to determine whether the conditions were sufficiently bad to warrant any action on their part. They found the conditions while, quote, unquote, not ideal, were not sufficiently bad that they --" oh "-- that they had quote, unquote, seen worse. This does not constitute a false complaint on my part.

"Ms. Abigail Smith, I think it's Abigail Smith, SPCA director was told --" no "-- director has told me in a phone conversation that no one from her agency had or ever would make any statement that my complaint had been quote, unquote, bogus or false. I have substantial background evidence to this issue having consulted with vets and with the New York Horse Health Assurance Program before taking any action. Ms. Smith will confirm our conversation

on the matter.

"Ms. Truttman states that I tried to keep her from being accepted quote, unquote, as a member by the Danby Volunteer Fire Company. Ms. Truttman knows that she did not fulfill the requirements for membership specified in the company bylaws. Pursuant to the bylaws, I moved that Ms. Truttman's probationary period be extended, the only option other than voting her out as a member.

"When the fire company voted Ms. Truttman in as a member contrary to the company bylaws and state law, I objected that the vote was invalid, I refused to participate in the vote and asked that my objection be noted in the minutes, which it is. This is a serious problem with the fire company that must be corrected and is far more important than whether any particular person is --" what could that be? I'm sorry I'll have to leave that word blank, I can't make that word out. "I will continue to pursue it legally as best I can.

"In summary, all five statements Ms. Truttman made in order to claim quote, unquote,

harassment on my part are demonstratively false. I believe her perjury is part of a pattern of larceny by false pretense and by false promise. But only the perjury occurred in the jurisdiction of the TPD, and I will pursue the other charges with the appropriate authority.

"The foregoing statements are true to my best knowledge, information and belief."

Q Would you agree the date of that statement is October 5, 2009?

A Yes.

Q When you went to the meeting of the Board of Fire Commissioners on March 23, 2010, did you go alone?

A Yes.

Q Did you share company that evening with anybody other than Ms. Linda Wyatt at the meeting?

A No.

Q About how long did the executive session last?

A I don't recall. I'm sorry, I don't recall.

Q About how long did the time -- how long

were you and Mr. Butler in the conference room after the executive session ended?

A One to two hours.

Q At any point during that one to two hours, did you get up and leave the room?

A Yes.

Q At any time during that one to two hours, did he get up and leave the room?

A I don't think so.

Q Did anybody else come into the room?

A No.

Q And when you left the room, what did you do?

A I spoke to Ms. Wyatt and called my wife.

Q On how many occasions did you leave the room?

A One.

Q Did you speak with Ms. Wyatt first and then call your wife or the reverse?

A I think I spoke with Ms. Wyatt first.

Q Did you make only one call to your wife?

A Yes.

Q And about how long were you out of the room on that one occasion?

A 10 minutes perhaps.

Q So then you returned to the room with Mr. Butler for however long it was, that one to two-hour period?

A Uh-huh.

Q Correct?

A Correct, yes.

Q At some point in time after you signed the resignation letter, did you then go back to the regular meeting of the Board of Fire Commissioners?

A No.

Q Was the regular meeting of the Board of Fire Commissioners still ongoing at the time you left the firehouse?

A Yes.

Q Based on what you're telling me, I guess you were not present when your resignation letter was presented to the board at the regular meeting?

A I think I was in the hallway.

Q Did you hear your letter being presented to the board?

A I heard what I gathered to be that, yeah.

Q What did you hear?

A I heard someone say they were regrettably -- with regret, accepting the resignation of Adam Crown as a member, and that's all it was.

Q Is there any issue about the return of your gear or equipment?

A Not to my knowledge.

Q Did you return -- what fire district equipment did you have at the time of your resignation?

A I had turnout gear, I had a key to the firehouse and a radio.

Q When did you return those? When did you return those?

A I don't remember.

Q To whom did you return them?

A To one of the assistant chiefs.

Q Which one?

A Joanne, her last name escapes me.

Q When you ran for commissioner in 2008, 2009, was there just one other candidate or were there multiple candidates?

A I think there was only one.

MR. HANNIGAN: I think that's all I

have for now. Mr. Shahan?

MR. SHAHAN: I just have a couple of follow-ups.

(RECESS)

(EXHIBIT NUMBERS 18, 19 AND 20 WERE MARKED FOR IDENTIFICATION)

RE-EXAMINATION BY

MR. SHAHAN:

Q In addition to filing, or attempting to file, criminal charges against Christel Truttman you also attempted to file criminal charges against Chief Gaden?

A Yes.

Q And that was after the Labor Relations or the Industrial Board of Appeals Hearing?

A Yes.

Q And in which agency did you attempt to file charges against?

A Tompkins County District Attorney.

Q And what did they respond?

A They opened an investigative file.

Q Did they direct you to a police agency?

A Yes.

Q Which police agency?

A State police.

Q Did you speak with anybody from the state police?

A Yes.

Q Did you make any written statement --

A I'm sorry?

Q Did you give a written statement to the state police?

A I believe so.

Q Where did you give that written statement?

A At their barracks out on Route 13.

Q Were you ever advised as to what became of that investigation?

A No.

Q Were there any conversations with the New York State Police regarding that investigation?

A No.

Q Do you remember any conversations with the Tompkins County District Attorney's Office regarding that investigation?

A No.

Q On the civil lawsuit you brought against Christel Truttman in Small Claims Court, that

arose out of an attempt to make a recording, correct?

A Correct.

Q And that was in the summer of 2007?

A I think it was later. Oh, no, that is right, that is right.

Q And you indicated to us that the lawsuit was -- you were unsuccessful in the Small Claims Court, correct?

A That is correct.

Q And you filed an appeal of that, correct?

A That is correct.

Q Handing you what's been marked as, slightly out of order, I'm going to hand you what's been marked as Exhibit 19 for identification purposes. Is that an affidavit of service regarding the transcript?

A Yes.

Q Who executed that affidavit of service?

A Linda Wyatt.

Q And is that service of the transcript on Ms. Truttman for the purpose of filing the appeal?

A Let me just read. Yes, that is correct.

Q What's the date on that affidavit of service?

A August 6, 2009.

Q And handing you what's been marked for identification purposes as Exhibit 20; do you recognize that?

A Yes.

Q And what is that?

A A notice of settlement of the transcript.

Q And what's the date on that?

A 3/2/10.

Q And that was your notice to the court that the transcript was settled for purposes of your appeal of the adverse ruling in Small Claims Court?

A That is correct.

Q I'm going to hand you what's been marked as Exhibit 18?

MR. ISSEKS: Is there a question?

Q Just want you to look through it. Do you recognize that document?

A Yes.

Q Is that the appeal that you filed with regard to the adverse ruling in the Small Claims

action?

A Yes.

Q And can you tell me the date that was filed?

A It's stamped March 25, 2010.

Q And can you tell me what happened as a result of that appeal?

A The appeal was denied.

Q Turning to page 12 of that appeal. You quote the perjury statute?

A Yes.

Q And you indicate that you believe Ms. Truttman committed perjury in her testimony?

A Yes.

Q This was after you filed a criminal complaint, or attempted to file a criminal complaint against her for the crime of perjury, correct?

A I think that's correct, yes.

Q Do you recall having a meeting with Chief Gaden and Assistant Chief Oliver in December of 2008?

A Not particularly.

Q Do you recall being asked by Assistant

Chief Oliver in or around December of 2008 you had not been showing up at the firehouse because Christel had been a member there?

A Do I recall her saying that to me?

Q Do you recall her asking you that question?

A No.

Q Do you recall telling Assistant Chief Oliver that you, ,quote, do not want to deal with any of you?

A I might have said that.

Q And do you recall saying to Assistant Chief Oliver shortly thereafter, quote, talking to you is like talking to a fucking wall, closed quote?

A I definitely said that.

Q What was -- that was at a meeting with Assistant Chief Oliver?

A I believe that was with Chief Gaden and Assistant Chief Oliver.

Q Was that in or around December 8, 2008?

A I don't recall.

Q Do you recall what your attendance was at fire department functions between the time Ms.

Truttman was voted in as a member and the time that she left for a semester abroad?

A No, I don't remember.

Q Do you recall being questioned about that at the meeting in December of 2008?

A No, I don't remember.

Q Throughout the course of this deposition, you have repeatedly answered questions by indicating that you would have to check your e-mail. Have you produced all of the e-mails that you have written with regard to Christel Truttman or the Danby Fire District to your attorney?

A I'm sorry, what was the question?

Q Have you produced all of the e-mail correspondence that you have in your possession with regard to your communication regarding the Danby Fire District, the Danby Fire Company or Ms. Truttman to your attorney?

A I think so.

Q Well, I have not received -- how many e-mails would you say there are?

A I don't know.

Q Do you recall there being testimony at

the Labor Relations or the Industrial Board of Appeals Hearing there were thousands of e-mails?

A I don't know.

Q I'd ask that you check your records and provide all of the e-mails that reference Christel Truttman, the Danby Fire Company or the Danby Fire District, or any dispute you may have had with any three of those, to your attorneys so they can provide them to the defendants.

(DOCUMENT REQUEST)

Q Did you ever keep a journal of events, other than keeping copies of e-mails?

A No.

Q Have you ever served as an officer in the Danby Fire Company?

A As an officer?

Q Yes.

A As an officer, no.

Q Have you ever served as an incident commander at an incident involving the Danby Fire Company?

A No.

MR. SHAHAN: Those are all of the questions I have.

RE-EXAMINATION BY MR. HANNIGAN:

Q Mr. Crown, have you taken any incident command courses?

A I'm sorry?

Q Have you taken any incident command courses?

A Not specifically, no.

Q I'm talking about ICS courses; do you know what I'm referring to when I say ICS?

A Yes.

Q You have not taken any of that series; is that correct?

A I don't think so.

Q You reference Exhibit 17 as being an editorial, this Fire Safe Danby --

A Right.

Q Is this, is this a newspaper that you publish?

A It's a blog.

Q It's a blog. Who else contributes to the blog?

A Linda Wyatt has contributed.

Q But is it, for the most part, a blog that

you complete?

A Yes, that is correct.

Q And you characterize this blog entry as an editorial, it really is just an blog entry?

A Well, it's editorial as opposed to information.

Q How did the PESH complaint get transmitted from the -- well, withdrawn.

Did you send the PESH complaint in or did somebody else?

A I sent it.

Q Did you send it through the mail?

A Yes.

Q Did you send it regular mail or registered or anything?

A I don't remember. I think I sent it both ways, first class and registered or certified.

Q Is it something you took to the post office and mailed as opposed to leaving in the mailbox?

A Yes.

Q Do you have the receipts for the date of mailing?

A I might have.

Q I ask that you produce the mailing receipts.

(DOCUMENT REQUEST)

Q And if you don't have mailing receipts, I'd ask that your counsel provide us with a statement to that effect.

(DOCUMENT REQUEST)

Q Other than the complaint I questioned you about earlier you made about Mr. Butler to the agency that oversees attorneys, have you made any complaint to any other entities about Mr. Butler?

A I don't think so.

MR. HANNIGAN: That's all I have.

MR. SHAHAN: I just have one or two more.

RE-EXAMINATION BY
MR. SHAHAN:

Q Have you made any criminal complaints about any of the other Danby Fire defendants, any of the other individually-named fire commissioners -- let me break that down.

Have you made any complaints about Mr. Oltz?

A Any criminal complaints are you asking?

Q Yeah. Have you ever attempted to have Mr. Oltz charged with any criminal charge?

A When I spoke to the district attorney, I told the district attorney the story and who gets charged with what is up to her.

Q Did you receive a copy of the statement that you gave to the New York State Police?

A I think I did, I'm not sure.

Q Could you please check your records for that?

A (Witness nods head).

MR. SHAHAN: I will note on the record the New York State Police have yet to respond to my FOIL request I made for a copy of their investigative file.

Q I would ask, on the record, you provide your counsel with any documents you have relative to the criminal complaint you made to the New York State Police.

MR. ISSEKS: Regarding what complaint?

MR. SHAHAN: Pardon?

MR. ISSEKS: Regarding what complaint?

MR. SHAHAN: Any criminal complaint.

MS. ISSEKS: Any criminal complaints.

MR. SHAHAN: Made to the New York State Police or any other law enforcement agency regarding the Danby Fire Districts, the Danby Volunteer Fire Company or any individually-named defendants.

(DOCUMENT REQUEST)

MR. SHAHAN: Those are all of the questions I have. Thank you for your time.

* * *

A F F I D A V I T

STATE OF NEW YORK

COUNTY OF ________

I have read my deposition, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the correction sheet attached hereto.

______________________

ADAM CROWN

SUBSCRIBED AND SWORN TO before me this _____ day of ______________, 20___.

______________________

NOTARY PUBLIC

My commission expires on ______________.

STATE OF NEW YORK

COUNTY OF STEUBEN

I, Christine Ferguson, do hereby certify that before the taking of the deposition, the said witness was by me first duly sworn to testify to the truth, the whole truth and nothing but the truth and that the above deposition was recorded by me in stenotype and reduced to typewriting under my supervision.

I further certify that the said deposition constitutes a true record of the testimony given by said witness to the best of my ability.

I further certify that the said deposition was taken before me at the time and place specified in the notice.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel or financially interested directly or indirectly in this action.

CHRISTINE FERGUSON

I N D E X

| Witness | Examination By | Pages |
|---|---|---|
| Adam Crown | Mr. Shahan | 3-71 |
| | | 132-139 |
| | | 142-144 |
| | Mr. Hannigan | 71-132 |
| | | 140-142 |

E X H I B I T S

| Number | Description | Page |
|---|---|---|
| 1 | Complaint | 3 |
| 2 | Letter | 3 |
| 3 | E-mail | 3 |
| 4 | E-mail | 3 |
| 5 | Summary of charges | 3 |
| 6 | E-mail | 3 |

E X H I B I T S (C O N T.)

| Number | Description | Page |
|---|---|---|
| 7 | Voluntary statement | 3 |
| 8 | Letter | 3 |
| 9 | Suspension letter | 3 |
| 10 | E-mail | 3 |
| 11 | Hearing notice | 3 |
| 12 | Letter | 3 |
| 13 | Letter | 3 |
| 14 | Letter | 3 |
| 15 | Notice - alleged safety hazard | 3 |
| 16 | E-mail | 46 |
| 17 | Blog | 46 |
| 18 | Argument and brief | 131 |
| 19 | Affidavit of service | 131 |
| 20 | Notice of settlement | 131 |

D O C U M E N T  R E Q U E S T  L I S T

| Page | Description |
|---|---|
| 24 | Records of when Christel Truttman became a fencing student |
| 29 | E-mails with Christel Truttman referencing her employment |
| 32 | Records to document dishonesty of Christel Truttman |
| 49 | Friday, March 12, 2010 teaching records |
| 139 | E-mails that reference Christel Truttman, the Danby Fire Company or the Danby Fire District or any dispute you may have had with any three of those |
| 141 | PESH complaint mailing receipts |
| 142 | If there's no record of mailing receipts to PESH, indicate so in writing |
| 144 | Documents regarding complaint made to the New York State Police or any other law enforcement agency regarding the Danby Fire Districts, the Danby Volunteer Fire Company or any individually-named defendants |