# EXHIBIT "H"

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

**ADAM CROWN,**

                        Plaintiff,             Civil Action No:  5:13-cv-269
                                           FJS/DEP

     v.

**DANBY FIRE DISTRICT, DANBY VOLUNTEER
FIRE COMPANY, PAT CAVENEY, RICHARD
OLTZ, RALPH BOWLES, WAYNE HOLDEN,
MATT COOPER, JOHN GADEN and MARK C.
BUTLER,**

                        Defendants.

---

### AFFIDAVIT OF JOHN GADEN

John Gaden being duly sworn deposes and says:

1. I am and at all times relevant hereto have been the Chief of the Danby Volunteer
   Fire Company.

2. I make this affidavit in opposition to the Motion for Summary Judgment brought by
   the plaintiff in regard to the above referenced matter.

3. The position of Chief of the Danby Volunteer Fire Company is an elected
   position – the Chief is elected by the Company to serve a one year term.

4. It is my understanding that New York Law requires that the Chief be approved by
   the Board of Fire Commissioners for the Fire District and that, as Chief, I answer to
   the Board of Fire Commissioners.

TADDEO & SHAHAN, LLP  •  THE EMPIRE BUILDING  •  SUITE 700  •  472 S. SALINA ST.  •  SYRACUSE, N.Y. 13202

5.  At the Industrial Board of Appeals (hereinafter "Board") hearing conducted in regard to Adam Crown's complaint to the Department of Labor, I was not represented by counsel.

6.  I appeared pursuant to subpoena issued by Adam Crown.

7.  Although the Fire District had an attorney there on certain days, he was not able to participate in the hearing itself.

8.  It was and remains my understanding that the hearing was with regard to Adam Crown's appeal of the determination by the Department of Labor that his claim for discrimination was unfounded and that the hearing was, therefore, between Mr. Crown and the Department of Labor.

9.  An attorney named Benjamin Shaw was representing the Department of Labor at the hearing and it was made plain to me that he was not there to represent me, the Danby Fire Company or the Danby Fire District.

10. Prior to my testimony, Mr. Shaw called me and spent only about a half an hour talking to me about the case on the phone.

11. He may also have spent a few minutes talking to me just before I testified.

TADDEO & SHAHAN, LLP  •  THE EMPIRE BUILDING  •  SUITE 700  •  472 S. SALINA ST.  •  SYRACUSE, N.Y. 13202

12. However, during these meetings Mr. Shaw did not show me any documents nor did he tell me what to expect in terms of questions from Mr. Crown or the Hearing Officer.

13. It also appeared that most if not all of the documents introduced as evidence in the hearing came from Mr. Crown.

14. One of the issues pertaining to my concern about Mr. Crown continuing to take classes at the Fire Academy without my knowledge or authorization from me or the Board of Fire Commissioners was the fact that he was no longer actively involved in the fire company.

15. He had not been to a meeting of the Fire Company since December 8, 2008.

16. He had not been to a training session since January 5, 2009.

17. He had not been to an emergency call since January 16, 2009.

18. During the hearing Mr. Crown testified that he had stopped going to calls and training because he did not feel "safe."

19. When I was asked by Mr. Crown about his not coming to training, meetings and calls, I replied that it was my impression that he was not doing so because he had a personal problem with another member.

20. Mr. Crown responded "let's go there" or words to that effect, but he never did.

21. More importantly, the attorney for the Department of Labor, did not follow up on it and ask what I meant by that.

22. Had he done so, I would have testified that Adam Crown had made it very plain that he had a personal dislike for one of our members, Christel Trutmann.

23. In fact, he used as one of the reasons for his complaint to PESH the fact that Ms. Trutmann had been voted in despite allegedly not meeting the requirements.

24. Had I been asked on cross examination, I would have testified that Mr. Crown had recruited Ms. Trutmann to the fire company and gave her glowing recommendations.

25. Between the time Ms. Trutmann joined the fire company and the time she came up for a membership vote it is my understanding that Mr. Crown and Ms. Trutmann (as well as her parents) had some kind of business deal involving a not for profit horse farm that had gone fallen apart and that Mr. Crown now had a great personal animosity for Ms. Trutmann.

26. Prior to the vote on Ms. Trutmann's membership, Mr. Crown met with me and made a vehement argument that Ms. Trutmann should not be confirmed for membership.

27. It was my impression then and it remains my impression that Mr. Crown's opposition to her membership had more to do with the end of their personal and business relationship than a true concern about her abilities.

28. This is based in part on my belief that Mr. Crown did not raise any objections to other members who may have missed some of the required meetings before being voted in as members.

29. Prior to the April, 2008 meeting at which Ms. Trutmann's membership was to be voted on, Simon Wyatt, another member of the department, who could not be present due to a class provided me with a letter of recommendation on behalf of Ms. Trutmann.  A true and correct copy of the letter is annexed hereto as Exhibit A.

30. The personal attacks and the vendetta referred to in the letter are references to attacks made by Adam Crown and, Simon's mother, Linda Wyatt against Ms. Trutmann.

31. I note that among the exhibits offered at the hearing contained an e-mail from Mr. Crown to Ms. Trutmann in which he states plainly, "Make no mistake, I have no desire to serve in a fire company with you."

5

TADDEO & SHAHAN, LLP   •   THE EMPIRE BUILDING   •   SUITE 700   •   472 S. SALINA ST   •   SYRACUSE, N.Y. 13202

32. At no time did the attorney for the Department of Labor ask me about this nor, to my knowledge, did he attempt to rebut Mr. Crown's allegations that he did not feel "safe" by cross examining him with regard to his failed personal and business relationship with Ms. Trutmann or these documents.

33. Nor did he cross examine Mr. Crown with the fact that his letter to the fire commissioners in April 2009 (complaining about the election of Ms. Trutmann to the fire company) made no reference to their personal dispute, to Simon Wyatt's letter nor did he include Mr. Wyatt's letter in the documents presented during the hearing.

34. Additionally, I believe at around the time charges were brought against Mr. Crown, he was suing Ms. Trutmann in small claims court over one of their alleged business agreements and that he lost that law suit.

35. In addition to not cross examining Mr. Crown on these issues, Mr. Shaw did not even question Ms. Trutmann about these matters.

36. In addition, when Jeff Baker, a former Danby member took the stand to testify that I had permitted him to use copies of training authorizations, Mr. Shaw did not cross examine him with regard to the fact that Mr. Baker had recently run for and lost an election to the Board of Fire Commissioners running on a platform taken directly from Mr. Crown's complaints.

37. Nor did he cross examine Mr. Baker with regard to the fact that when Mr. Baker was taking classes, the law did not require authorization from the fire district or fire chief for classes take out of the home county.

38. Since Mr. Shaw was not representing the fire company or district and did not meet with us regarding Mr. Baker's testimony he could not even rebut Mr. Baker's testimony that he was an "active member" of the fire company until 2001.

39. Annexed hereto as Exhibit B is a copy of Mr. Baker's letter of resignation clearly indicating that he resigned as of January 19, 1998.

40. Moreover, he could further have asked me or other members of the Danby Fire Company to testify regarding Mr. Baker's attitude that he did not have to do anything he did not want to do because he was a volunteer or that he quit after failing to get elected as an officer.

41. As I understand it, Mr. Shaw was representing the Department of Labor and not the Danby Fire Company or Fire District in this proceeding and so while I understand he may have had his own strategy for doing that, I don't think it is fair that his representation of the Department of Labor should substitute for an aggressive defense of the Fire District/Company.

TADDEO & SHAHAN, LLP  •  THE EMPIRE BUILDING  •  SUITE 700  •  472 S. SALINA ST.  •  SYRACUSE, N.Y. 13202

7

42. While I was on the witness stand, the hearing officer reminded the participants the issue was whether the "investigation that led up to the determination here was flawed."

43. He further stated that the hearing is about "your complaint that the investigation that was done that led to the determination made in your case was not a reasonable one, it was not a fair one."

44. I understood these comments to mean that the hearing was with regard to whether the investigator for the Department of Labor had properly investigated Mr. Crown's complaint to the Department.

45. Although I understand that the Board made a determination that the Commissioner of Labor improperly dismissed Mr. Crown's complaint, I understand that the matter was referred to the Attorney General's Office and that the Attorney General could bring a law suit against the Danby Fire Company/District at which time the Danby Fire Company and District would have a chance to defend themselves.

46. To my knowledge, the Attorney General's Office has never notified the Danby Fire Company or Fire District of a lawsuit.

47. Given that, I don't think it is fair that the Danby Fire Company and/or Fire District should be deprived of a chance to defend themselves fully.

48. On another issue I understand that the plaintiff has sued both the Fire Company and the Fire District.

49. The Fire Company played no role whatsoever in the discipline brought against Mr. Crown.

50. I as Chief of the Department brought charges against Mr. Crown and brought those charges to the attention of the Fire District.

51. The Fire District, in turn, and in accordance with the By-Laws of the Fire Company was prepared to move forward with a hearing pursuant to GML section 209-l.

52. This action did not require any action on the part of the Fire Company and, at no time has the Fire Company voted to deprive Mr. Crown of any membership rights.

Dated:   **March 25, 2014**

John Gaden

Sworn to before me this 25TH

day of March , 2014

Notary Public

STEVEN C. SHAHAN
Notary Public, State of New York
No. 01 SH 6135832
Qualified in Onondaga County
Commission Expires May 15, 20__

9

EXHIBIT A

Simon Wyatt
20 W Miller Rd
Ithaca NY 14850

April 14th, 2008

To the members of the Danby Volunteer Fire Company:

Because I am taking the Intro to Fire Officer course, I am unable to attend tonight's business meeting, so I am writing this letter to the company regarding Christel's probation.

Over the last several months I have had occasion to hear an incredible variety of accusations made against Christel, of just about every kind of immoral and illegal conduct. Lack of dedication is just about the mildest of these; I have been the audience to elaborate stories of schemes of manipulation, fraud, and blackmail.

But each time I've asked Christel about any of these allegations, she has been not merely forthcoming but insistent upon showing me documentation of the whole story, which has, I feel, in every instance supported her, and supported the conclusion that all of this condemnation has been only the product of the tragic human tendency to look for the absolute worst in people who have hurt us and to view their every action in the worst possible light.

I am sure she would be equally glad to answer any questions any of you may have about the entire mess — were it not entirely irrelevant to the question of her capability and commitment to act, as a member of this fire company, to preserve the property and the lives of our community, and of her work ethic and compassion for others.

It does no harm for you each to answer that question yourselves, no matter the reasons for which it has been asked.

But this personal vendetta should never have been brought here, and I feel obliged to share what I've seen from being caught in the middle of it, so that you can better make a decision and move on to other business.

Simon Wyatt

Simon Wyatt

EXHIBIT B

Jeffrey N. Baker
235 Ridgecrest Rd.
Ithaca, N.Y. 14850

Chief, John Gaden
Danby Fire Dept.
1780 Danby Rd.
Ithaca, N.Y. 14850



Dear Chief Gaden,

    I wish too inform you that I am terminating my position in the Danby Fire Department.  I am also requesting a copy of my personal file including my medical records which can be send to me at the above address. This resignation is effective as of 1/19/98.

Sincerely,

Jeffrey N. Baker

CC Chris Jordan

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

  ADAM CROWN,

          Plaintiff,

     -vs-                 CVA #: 5:13-cv-269

  DANBY FIRE DISTRICT, DANBY VOLUNTEER FIRE
COMPANY, PAT CAVENEY, RICHARD OLTZ, RALPH
BOWLES, WAYNE HOLDEN, MATT COOPER, JOHN GADEN
and MARK C. BUTLER,

         Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

              Deposition of JOHN GADEN,

      Defendant, held at the offices of Taddeo

      & Shahan, LLP, Syracuse, New York, on

      July 24, 2014, before DEBORAH R.

      SALESKI, Court Reporter and Notary

      Public in and for the State of New York.





Jefferson Clinton Commons - 211 W. Jefferson St. - Suite 21
Syracuse, New York 13202

315.428.9311   800.515.DEPO
www.actionreporting.com

2

APPEARANCES:

For the Plaintiff:

  ROBERT N. ISSEKS, ESQ.
  Attorney at Law
  6 North Street
  Middletown, New York 10940
  (845) 344-4322


For the Defendant Danby Fire District, Danby Volunteer
Fire Company, Caveney, Oltz, Bowles, Holden, Cooper,
Gaden:

  TADDEO & SHAHAN, LLP
  Attorneys at Law
  472 South Salina Street
  Syracuse, New York 13202
  BY:  STEVEN SHAHAN, ESQ.
  (315) 422-6666


For the Defendant Butler:

  HANNIGAN LAW FIRM, PLLC
  Attorneys at Law
  1881 Western Avenue, Suite 140
  Albany, New York 12203
  BY:  TERENCE S. HANNIGAN, ESQ
  (518)869-9911


                 *              *              *

3

QUESTION MARKED FOR RULING

1.   Page 11, Lines 7 through 18:
     Q.    Had you ever been informed of the information
that Mr. Crown was looking for?
     A.    Yes.
     Q.    And how did you -- how did that come about?
     A.    From district --
           MR. SHAHAN:  Note my objection to
           anything that was said by the district in
           executive session or said to Mr. Chief Gaden
           in the presence of Mark Butler and the fire
           district's attorney.
           MR. ISSEKS:  Please note that for a
           ruling.

4

1

2    IT IS HEREBY STIPULATED by and between

3    counsel for the respective parties that this

4    Deposition is to be held pursuant to the

5    provisions of the Federal Rules and

6    Regulations; that the presence of a Referee is

7    waived; that the signing of the transcript is

8    reserved; the filing of the transcript is

9    waived; that the witness may be sworn by

10    DEBORAH R. SALESKI, Notary Public in and for

11    the State of New York; and that all

12    objections, except those as to form are

13    reserved until the time of the trial.

14

15    *    *    *

16

17 J O H N  G A D E N, having been called as a witness,

18 being duly sworn by the notary public present, testified

19 as follows:

20

21 EXAMINATION BY MR. ISSEKS:

22  Q.  Good morning, Mr. Gaden.

23  A.  Good morning.

24  Q.  My name is Bob Isseks and I represent Adam

25 Crown in this lawsuit.  Are you the chief of the Danby

5

1

2    Fire District?

3        A.    Danby Fire Company.

4        Q.    Fire Company.  And how long have you been

5    chief of the Danby Fire Company?

6        A.    Eighteen years.

7        Q.    Do you know Adam Crown?

8        A.    Yes.

9        Q.    When was the first time you met Adam Crown?

10       A.    2007.

11       Q.    Was Mr. Crown a member of the Danby Fire

12   Company at that time?

13       A.    No, that's when he joined I believe.

14       Q.    He joined at that time?

15       A.    (Nods head.)

16       Q.    Did you have any conversation with Mr. Crown

17   the first time you met him in 2007?

18       A.    Probably.  Yes.

19       Q.    Do you recall anything that was said in that

20   conversation?

21       A.    No.

22       Q.    Now, during the time that Mr. Crown was a

23   member of the Danby Fire Company did you have occasions

24   to speak with him?

25       A.    Yes.

6

1

2      Q.      How many times?

3      A.      I don't recall.

4      Q.      More or less than ten times?

5      A.      Probably more than ten.  I can't swear.

6      Q.      During those occasions when you and Mr. Crown

7  spoke did Mr. Crown express any concerns or criticism

8  about the way the fire company or the Danby Fire District

9  was being managed?

10             MR. SHAHAN:  Object to the form, but you

11             can answer.

12     A.      No.

13     Q.      He did not?

14     A.      No.

15     Q.      Did Mr. Crown in any of the conversations that

16  you had with him express or raise any questions about the

17  operation of the Danby Fire District or Danby Fire

18  Company?

19             MR. SHAHAN:  Object to the form.  You can

20             answer.

21     A.      I don't recall.

22     Q.      Do you recall the subject of any conversation

23  that you had with Mr. Crown while Mr. Crown was a member

24  of the company?

25     A.      About a couple of trainings, just going over

7

1

2    the type of trainings we did for the night.

3        Q.    Did you ever have a conversation with Mr.

4    Crown about taking courses at the New York State fire

5    training academy?

6        A.    Yes.

7        Q.    How many conversations did you have with him

8    about that subject?

9        A.    I don't recall how many.

10       Q.    More or less than five?

11       A.    I'd say less than five.

12       Q.    And when did those conversations take place?

13       A.    I could not give you dates.

14       Q.    Did they take place in 2009?

15       A.    Like I say, I can't tell you an exact year.

16       Q.    What was said during those conversations where

17   you discussed his taking courses at the training academy?

18       A.    I don't remember.

19       Q.    In order for Mr. Crown to take a course at the

20   training academy while he was a member of the fire

21   company, did he need to get an application signed by you?

22       A.    Yes.

23       Q.    And did that topic come up in any of your

24   conversations with Mr. Crown?

25       A.    Yes.

8

```
 1
 2        Q.    When?
 3        A.    When he wanted to take a couple of classes.
 4        Q.    Do you remember when that was?
 5        A.    I don't recall the dates, no.
 6        Q.    Do you recall what was said when you discussed
 7   that topic with him?
 8        A.    No.
 9        Q.    Did Mr. Crown ask you to provide him with a
10   signed application?
11        A.    Yes.
12        Q.    Okay.  And did you?
13        A.    Yes.
14        Q.    Was there any occasion other than that where
15   the topic of a signed application to go to the academy
16   was discussed between you and Mr. Crown?
17        A.    I don't understand your question.
18        Q.    Well, you've just testified about one occasion
19   where the topic of your signing an application for his
20   attending the academy was discussed and that you did sign
21   an application for him to attend the academy?
22        A.    Correct.
23        Q.    I'm now asking you if there was any other
24   conversation that you had with him concerning your
25   signing an application for him to attend the academy?
```

9

1

2      A.      If you're asking -- are you asking if I signed

3   more than one application?

4      Q.      I'm asking if you ever discussed with him the

5   signing of any other application after that one

6   conversation that you just testified about where you did

7   sign an application?

8      A.      Yes.

9      Q.      When did the other conversation or

10  conversations take place?

11     A.      I don't recall the dates.

12     Q.      Was it before or after the conversation where

13  you did sign an application?

14     A.      It would be after.

15     Q.      How much after?

16     A.      I could not tell you how long, about a month

17  are two months, six months.

18     Q.      What was said in that conversation concerning

19  your signing an application for him?

20     A.      I don't recall.

21     Q.      Do you recall if you signed an application for

22  him at that conversation?

23     A.      I signed a couple applications for him for

24  fire academy.

25     Q.      Do you recall which ones or which courses?

10

1

2      A.      I for the legal issue and Fire Officer I.

3      Q.      Did you sign any other applications for him?

4      A.      Those are the only two I remember.

5      Q.      Well, do you recall whether or not you signed

6  any other applications for him?

7      A.      No.

8      Q.      You don't recall or you know you did not?

9      A.      I don't recall signing any other ones.

10     Q.      Do you know that you did not sign any others?

11     A.      Yes, I know I did not sign other ones.

12     Q.      Did you have any conversation with before

13 about -- withdraw that.

14             Did there come a time when you learned that

15 Mr. Crown was making Freedom of Information Law requests

16 of the fire district?

17     A.      Yes.

18     Q.      When did you first learn of that?

19     A.      I don't recall the dates.

20     Q.      Can you recall what year it was?

21     A.      Not -- no.

22     Q.      How many Freedom of Information Law requests

23 did Mr. Crown make approximately?

24     A.      I don't know.

25     Q.      Can you approximate?

11

1

2    A.    I can't even guess on that approximately.

3    Q.    Do you recall the general nature of those

4    Freedom of Information Law requests, that is, what sort

5    of information Mr. Crown was looking for?

6    A.    No, they were through the district not to me.

7    Q.    Had you ever been informed of the information

8    that Mr. Crown was looking for?

9    A.    Yes.

10   Q.    And how did you -- how did that come about?

11   A.    From district --

12        MR. SHAHAN:  Note my objection to

13        anything that was said by the district in

14        executive session or said to Mr. Chief Gaden

15        in the presence of Mark Butler and the fire

16        district's attorney.

17        MR. ISSEKS:  Please note that for a

18        ruling.

19   Q.    But did you learn of the Freedom of

20   Information Law requests outside of an executive session?

21   A.    Yes.

22   Q.    From whom did you learn about them?

23   A.    From the district.

24   Q.    And who in the district?

25   A.    Would be probably the secretary.

12

1

2      Q.     And what, if anything, did the secretary say

3   to you with respect it those requests?

4      A.     She -- nothing to me.  It was brought up

5   probably at one of the meetings.

6      Q.     Outside of an executive session or in

7   conversations with Mr. Butler, did you have any

8   conversations with anyone concerning Mr. Crown's Freedom

9   of Information Law request?

10     A.     No.

11     Q.     Did you speak to Mr. Crown about it?

12     A.     No.

13     Q.     Now, there came a time what you accused Mr.

14  Crown of forging your signature; is that correct?

15     A.     Yes.

16     Q.     And when was the first time you made that

17  accusation?

18     A.     I don't recall the dates for it.

19     Q.     Upon what information did you base your

20  accusation that Mr. Crown had forged your signature?

21     A.     After I received his stuff from the state.

22     Q.     After you received what stuff from the state?

23     A.     The information to who signed on -- signature

24  for the class he was taking.

25     Q.     And what class was that?

13

1

2      A.    Fire Officer III.

3      Q.    And when was it that you received that

4   information from the state?

5      A.    I don't recall the exact dates for it.

6      Q.    Do you recall the year?

7      A.    I would be guessing.

8      Q.    Do you have any idea what year it was that you

9   learned from the state that Mr. Crown took that course,

10  Fire Officer III course?

11     A.    I would guess 2010.  2009, 2010.

12     Q.    And when you learned that Mr. Crown took that

13  course, what, if anything, did you do?

14     A.    I did a FOIL request to the state to see who

15  authorized for him to take it.

16     Q.    Now, was this before or after you had learned

17  about Mr. Crown's FOIL requests?

18     A.    I would say it's after.

19     Q.    How much after?

20     A.    I could not tell you.

21     Q.    It was more or less than a month?

22     A.    Probably, yes.

23     Q.    More or less?

24     A.    I would say it's more.

25     Q.    More than a month?

14

1

2      A.     More than a month.

3      Q.     How about two months?

4      A.     Probably more than two months.

5      Q.     So you learned about Mr. Crown's FOIL requests

6  and then about two months later you learned that he had

7  taken an Officers III course?

8                  MR. HANNIGAN:  Object to the form.

9                  MR. SHAHAN:  Object to the form.

10     Q.     Is that correct?

11                 MR. SHAHAN:  Go ahead and answer.

12     A.     Could you repeat your question?

13     Q.     Well, am I correct that you filed a Freedom of

14  Information Law request with the state when you learned

15  that Mr. Crown had taken a course, correct?

16     A.     Correct.

17     Q.     And the particular course --

18                 MR. HANNIGAN:  Object to the form.

19     Q.     -- that you learned that he took was what?

20     A.     Pardon?

21     Q.     The course that you learned that Mr. Crown

22  took that caused you to take your Freedom of Information

23  Law request, was what course?

24                 MR. HANNIGAN:  Object to the form.

25                 MR. SHAHAN:  Object to the form.  Go

15

1

2          ahead.

3      A.     Fire Officer III.

4      Q.     Okay.  And when you learned that Mr. Crown had

5    taken the Fire Officer III course, had you already

6    learned that he had been making Freedom of Information

7    Law requests?

8              MR. HANNIGAN:  Object to the form.

9              MR. SHAHAN:  Object to the form.  Go

10          ahead.

11     A.     Yes.

12     Q.     And it was about two months after you learned

13   his Freedom of Information Law requests that you made

14   your FOIL request of the state?

15             MR. SHAHAN:  Object to the form.

16     A.     It's probably more than two months after that.

17     Q.     What did you learn in response to your Freedom

18   of Information Law request --

19     A.     That --

20     Q.     -- if anything?

21     A.     That he turned in a document with a photocopy

22   of my signature onto it.

23     Q.     When you learned that, what, if anything, did

24   you do?

25     A.     I asked him to come to a meeting to discuss

16

1

2    it.

3         Q.    And when was that?

4         A.    I do not recall exact dates.

5         Q.    Okay.  And when you asked Mr. Crown to come to

6    a meeting, did you do that by phone, mail or some other

7    means?

8         A.    I believe it was by mail and possibly e-mail.

9         Q.    Okay.  Did Mr. Crown respond to your request

10   that he meet with you?

11        A.    Yes.

12        Q.    What was his response?

13        A.    He would not -- did not meet with us -- with

14   me.

15        Q.    What was his response?

16        A.    His response was --

17             MR. SHAHAN:  Note my objection to the

18             form, but go ahead with your answer.

19        Q.    Did you hear back from him when you asked him

20   to meet with you?

21        A.    Yes.

22        Q.    And what did you hear him say?

23        A.    I'm trying to remember what exactly.  It's

24   been several years.  And the only thing I can recall is

25   something about the time frame or something.

17

1

2          Q.     And did you respond to that?

3          A.     Yes.

4          Q.     What was your response to that?

5          A.     We set up a time for where we thought we both

6     could meet.

7          Q.     And what time was that?

8          A.     It would have been after work, so it would

9     have to be after 5.

10         Q.     And the time that you set up to meet, do you

11    remember the date that you set up to meet?

12         A.     No.

13         Q.     Okay.  And did you meet at the time that you

14    set up?

15         A.     He did not show up.

16         Q.     Did he explain to you why he didn't show up?

17         A.     No.

18         Q.     And what, if anything, did you do then?

19         A.     I sent him a letter and suspended him for not

20    showing up.

21         Q.     Did Mr. Crown ever express to you that he

22    believed that the district and the company were operating

23    in a fiscally irresponsible manner?

24         A.     I don't recall any.

25         Q.     Did he ever express to you that he thought

18

1

2     that the company was not operating efficiently?

3         A.    I do not recall.

4         Q.    When you say you don't recall --

5         A.    It means I don't remember.

6         Q.    You just don't remember if he did or didn't?

7         A.    Correct.

8         Q.    Did Mr. Crown ever express to you his opinion

9     that the equipment that was being used by the company and

10    the district were inadequate and unsafe?

11              MR. HANNIGAN:  Object to the form.

12              MR. SHAHAN:  Object to the form.

13        A.    No.

14        Q.    Did there come a time when you learned that

15    Mr. Crown had gone to people outside of the fire district

16    expressing concerns about the way the company was being

17    operated?

18        A.    No.

19        Q.    Have you ever signed an application for

20    attendance at the training academy that had been filled

21    in before you signed it?

22        A.    No.

23        Q.    The form that you say you received in response

24    to your FOIL request that had been a Xeroxed copy of your

25    signature, how did you determine that was a Xeroxed copy

1

2     of your signature?

3          A.     The form was an old form.  It was two years

4     old the date onto it next to my signature.

5          Q.     Did you ever have any conversations with any

6     member of the board of fire commissioners about Mr. Crown

7     outside of executive session and outside the presence of

8     Mr. Butler?

9          A.     I don't recall any.

10         Q.     Did there come a time when you learned that a

11    complaint had been filed with the Department of Labor

12    concerning Danby?

13         A.     Yes.

14         Q.     When did you learn that?

15         A.     When the PESH inspector showed up on our

16    doorstep.

17         Q.     When was that?

18         A.     I don't recall the exact date.

19         Q.     Do you recall the month that you learned that?

20         A.     No.  I would be guessing.

21         Q.     Can you approximate?

22                MR. SHAHAN:  Direct the witness not to

23                guess.  You can estimate.

24         A.     I would estimate in the fall.

25         Q.     Of?

20

1

2       A.      I'm not sure which year.  I mean to estimate

3   2011, 2010, 2011.  I don't know.

4       Q.      And this is after charges were brought against

5   Mr. Crown?

6               MR. SHAHAN:  Object to the form.  You can

7               answer.

8       A.      Yes.

9       Q.      So before the forgery charges were brought

10  against Mr. Crown you did not know that a complaint had

11  been made to the Department of Labor?

12      A.      No.

13      Q.      One second.

14              (Whereupon, there was a pause in the

15              proceeding.)

16              MR. ISSEKS:  I have no further questions.

17              MR. HANNIGAN:  Thank you, Chief, I have

18              nothing.

19              (Time:  11:50 a.m.)

20

21          *                    *                    *

22

23

24

25

21

1

2   STATE OF NEW YORK

3           ss.

4   COUNTY OF ONONDAGA

5

6                      CERTIFICATE OF WITNESS

7     I, John Gaden, hereby certify that I have read the

8   foregoing transcript of my deposition taken July 24,

9   2014, at Syracuse, New York, pursuant to the applicable

10   rules of Civil Procedure, and that the foregoing 20 pages

11   of transcript are in conformity with my testimony given

12   at that time (with the exception of any corrections made

13   by me, in ink, and initialed by me on the attached errata

14   sheet.)

15   _____

     John Gaden
16

17   STATE OF NEW YORK

18   COUNTY OF ONONDAGA

19           SUBSCRIBED AND SWORN to before me, the undersigned

20   authority on this the _____ day of _____, 20____.

21   _____

22   Notary Public in and for

23   _____ County, State of New York

24   My Commission Expires_____

25

REPORTER'S CERTIFICATE


I, DEBORAH R. SALESKI, Court Reporter and Notary Public, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken;

I further certify that I am not a relative or employee of any attorney or of any of the parties nor financially interested in the action.


_Deborah R. Saleski_

DEBORAH R. SALESKI

Notary Public